LEWIS, Mamie A., Appellant,

v.

CALIFANO, Joseph, Jr., Secretary of the United States Department of Health, Education and Welfare (D.C. Civil No. 78–0861).

No. 79–1739.

United States Court of Appeals, Third Circuit.

Argued Dec. 14, 1979.

Decided Feb. 21, 1980.

Kenneth A. Wise (Argued), Harrisburg, Pa., and William C. Anderson, York, Pa., for appellant.

Charles M. O'Malley, Jr., U.S. Atty., Paul J. Killion, Asst. U.S. Atty., Harrisburg, Pa., and Stephanie W. Naidoff, Regional Atty., David R. Culp, Deputy Regional Atty. (Argued), Joseph M. Masiuk, Asst. Regional Atty., Karen Pushaw, Legal Asst., Dept. of Health, Education and Welfare, Philadelphia, Pa., for appellee.

Before ALDISERT, VAN DUSEN and HUNTER, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Senior Circuit Judge.

In this appeal, Mamie Lewis challenges the district court's grant of summary judgment for defendant, including its holding that her religious beliefs do not qualify as good cause for her decision to decline remedial surgery under 20 C.F.R. § 404.1507 (1977), and the conclusion of the Department of Health, Education and Welfare (HEW) that she is not disabled within the meaning of 42 U.S.C. §§ 416(i)(1) and 423(d) (1976)[1] and 42 U.S.C. § 1381a. Lewis' claim for disability benefits was denied by an administrative law judge (ALJ) in an opinion after a hearing at which Lewis was represented by counsel. The ruling of the ALJ became the final decision of the Secretary of HEW when it was approved by

---

1. Disability is defined by the statute as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (1976). It is further limited as follows:

"[A]n individual . . . shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if applied for work."
Id., § 423(d)(2)(A).

HEW's Appeals Council on Lewis' request for review. Lewis then filed suit in the district court under the authority of 42 U.S.C. § 405(g), seeking reversal of HEW's decision or a remand to the agency for an additional hearing in order that further evidence could be developed. After both parties had moved for summary judgment, the district court referred the case to a magistrate, who recommended the grant of summary judgment for the defendant Secretary. In a separate opinion, the district court adopted the magistrate's opinion and independently stated its reasons for such grant of summary judgment for the defendant. The case comes before us on appeal under 28 U.S.C. § 1291. We vacate the district court order and remand the case to the district court for entry of an order remanding the case to the Secretary for further evaluation and consideration.

## FACTS

Lewis (claimant) is 55 years old. She worked as a clerk-typist for the Commonwealth of Pennsylvania from 1955 until 1967, when she left work due to back problems. From 1969 until February 1977 she was employed as a cafeteria assistant for the Harrisburg School District, working approximately 2½ hours per day preparing frozen lunches and cleaning up after lunch.

The medical evidence examined by the ALJ consisted of medical reports from several doctors. These reports indicated that claimant has had a massive uterine tumor since 1967. A 1974 medical report noted that claimant had difficulty moving and breathing because of the pressure created by the tumor. An April 27, 1977, letter of Dr. Charles Delone stated that the tumor was larger than a full-term fetus. A July 14, 1977, report of Dr. S. Clayton, who works for the Dauphin County Board of Assistance and saw claimant at the request of the welfare authorities, concluded that claimant could not work as a result of her condition.

Claimant testified at the hearing that she had substantial pain, weakness and shortness of breath (Ap. 31–33). Claimant also testified concerning her daily routine to the effect that she became exhausted doing light housework and had reduced her participation in church events, although she was still in the choir.

Claimant had been repeatedly advised by her doctors that the tumor could be surgically removed and that she would be cured if she underwent a hysterectomy. The ALJ found that the condition was remediable with surgery.

Claimant has consistently refused to undergo such surgery due to her religious belief in faith healing. Claimant is a devout member of the Church of God. Her minister accompanied her to the hearing before the ALJ and testified concerning the Church's tenets and Lewis' beliefs. The minister explained that the Church had no tenet against resorting to surgery, but that he was willing to pray with claimant to achieve her cure. The minister stated that he supported her decision to rely on divine healing. Claimant testified that she believed in divine healing because she had been relieved of a back ailment in 1967 without the aid of medical science. She attributed this cure to the power of prayer. The ALJ stated that "[t]he claimant indicated at the hearing that she is reluctant to undergo surgery as a result of her religious beliefs." Although defendant does not challenge her religious belief as the cause of claimant's refusal of surgery for a condition "remediable with surgery," neither the ALJ nor the Appeals Council made a specific finding that claimant was sincere in her stated religious objection to surgery on her abdomen (Ap. 14–15).

The ALJ also noted claimant's physical appearance as part of the evidence available for determining disability. The ALJ stated that "[a]t the hearing she appeared to be healthy and answered the questions clearly and intelligently. She was a soft-spoken, very pleasant woman who did not appear to be disabled." This was the final piece of evidence noted by the ALJ.

After reviewing the evidence, the ALJ concluded that the claimant was not disabled. The ALJ stated that:

"Having considered the claimant's age, education, and work experience, and in light of her testimony, medical reports and doctor's opinions, it is this Administrative Law Judge's conclusion that the claimant is not disabled. Her problem is not so significantly severe that it would prevent her from working. The condition is remediable with surgery. Therefore in light of these facts it is this Administrative Law Judge's conclusion that the claimant is not entitled to disability insurance benefits or supplemental security income benefits."

The ALJ's opinion was adopted by the Secretary.

The claimant appeals on the basis of lack of evidence to support this finding of non-disability by the Secretary and argues that, if we conclude that claimant is disabled, we must award her benefits because her religious belief in faith healing is justifiable cause for refusing to accept remedial surgery under the regulations to § 423, which deny disability benefits to claimants who willfully refuse to undergo remedial care to cure their disability, unless the claimant can show "justifiable cause" for such refusal. 20 C.F.R. § 404.1507 (1977).

## DISABILITY

■ In reviewing the Secretary's finding of disability we are mindful that any findings of fact by the Secretary must be accepted as conclusive by a reviewing court "if supported by substantial evidence." 42 U.S.C. § 405(g) (1976). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), *Dobrowolsky v. Califano*, 606 F.2d 403 (3d Cir. 1979).

■ In this case, claimant offered substantial evidence concerning the details of her ailment. Most importantly she submitted the report of Dr. Clayton, who was hired by the Dauphin County Board of Assistance to determine whether claimant was disabled in regard to her obtaining welfare benefits. Dr. Clayton found that claimant "cannot work." This doctor made the finding for another government agency, and his finding is entitled to substantial weight. Clearly, from this evidence, claimant has carried her initial burden to prove disability.

The burden now shifts to the Secretary to prove non-disability. The ALJ offers no explanation why he rejected Dr. Clayton's finding or claimant's subjective complaints concerning her health. The ALJ's review of the evidence demonstrates only two factors which might serve to justify his conclusion. First, after describing petitioner's daily routine, he concludes that "[h]er ability to get around and function normally appears to be generally unimpeded." In view of the fact that claimant has difficulty moving and breathing,[2] frequently feels too sick to go to church[3] or clean her house,[4] needs assistance to do shopping[5] and spends 12 hours a day in bed,[6] the ALJ's conclusion concerning normal functioning is not supported by substantial evidence.

■ The second piece of evidence noted which might support the ALJ's ultimate conclusion is his statement concerning her appearance. He stated that "[a]t the hearing she appeared to be healthy and answered the questions clearly and intelligently. She was a soft-spoken very pleasant woman who did not appear to be disabled." Although physical appearance may be a factor to consider, the ALJ could not determine from claimant's appearance alone that she was not disabled by her tumor. See *Williams v. Finch*, 440 F.2d 613 (5th Cir. 1971). The ALJ rejected a professional medical opinion on the basis of his own observation. As we noted in *Gober v. Matthews*, 574 F.2d 772, 777 (3d Cir. 1978), an ALJ "is not free to set his own expertise against that of a

---

2. Exhibit 22.

3. Ap. 40, 49.

4. Ap. 39 40.

5. Ap. 45–47.

6. ALJ op. at 4.

physician who testified before him." On the record in this case, claimant's healthy appearance does not constitute substantial evidence supporting the ALJ's ultimate finding.

Quite simply, the ALJ had no evidence to rebut the claimant's prima facie case based on the medical evidence, and the Secretary should have determined that the claimant was disabled.

## WILLFUL REJECTION OF MEDICAL TREATMENT ON RELIGIOUS GROUNDS

Having determined that claimant is disabled on this record, we address the question of whether claimant's religious objections to surgery justify her decision willfully to refuse treatment to correct a remediable condition, since it was raised by counsel in the district court and in this court. Although the ALJ never reached this question as a basis for his decision [7] due to his finding of non-disability, he did find that claimant's condition was "remediable." From this finding, the Secretary now argues that even if the claimant is disabled, she may not obtain benefits because she has failed to comply with 20 C.F.R. § 404.1507 (1977), which requires claimants to obtain treatment for remediable conditions that produce disability. The regulation provides in pertinent part:

"An individual with a disabling impairment which is amenable to treatment that could be expected to restore his ability to work shall be deemed to be under a disability if he is undergoing therapy pre-

scribed by his treatment sources but his impairment has nevertheless continued to be disabling or can be expected to be disabling for at least 12 months. However, an individual who willfully fails to follow such prescribed treatment cannot by virtue of such failure be found to be under a disability. Willful failure does not exist if there is justifiable cause for failure to follow such treatment."

The issue raised by counsel is whether claimant's religious belief is a "justifiable cause" for declining surgery.

The leading case in determining whether a person may obtain benefits under a government program, despite refusal for religious reasons to comply with a condition to the entitlement, is *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). In *Sherbert* the Court held that the free exercise clause of the First Amendment [8] prevented South Carolina from denying unemployment compensation to a Seventh-Day Adventist, who had willfully refused to accept a job which required work on Saturday, the day of rest in the Seventh-Day Adventist Church. The Court held that the religious belief of the claimant was a justifiable cause for her willful refusal to accept employment.

In arriving at its conclusion, the Court weighed the governmental interests against the claimant's First Amendment interests in the free exercise of her religion. The government had two interests. The first interest was to reduce the payments made out of the unemployment compensation funds.[9] The second interest was to protect

---

7. We note that an administrative judge "[is not] required even to consider [a constitutional challenge in an adjudicatory context]." See *Mathews v. Eldridge*, 424 U.S. 319, 330, 96 S.Ct. 893, 900, 47 L.Ed.2d 18 (1976).

8. "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; . . . ." U.S.Const., Amend. I.

9. The *Sherbert* opinion pointed out at note 2 (p. 399 of 374 U.S. p. 1791 of 83 S.Ct.):
   "In filing her claim with the Commission, she expressed a willingness to accept employment at other mills, or even in another industry, so long as Saturday work was not re-

quired. The record indicates that of the 150 or more Seventh-day Adventists in the Spartanburg area, only appellant and one other have been unable to find suitable non-Saturday employment."

There is nothing in this record to indicate that only one other person, in addition to appellant, will be drawing federal social security benefits because of the religious belief controlling the action of claimant in this case. If the defendant finds the burden of paying the disability benefit funds to those non-Christian Scientists and non-California Church of God members (see *Montgomery* case, cited below), who adhere to a belief in faith healing of the type of this plaintiff, is sufficiently great, it will have

the fund from fraudulent claims made by individuals claiming that their religion prevented them from performing certain work and thereby obtaining benefits. The Court held that these financial interests of the government did not justify the infringement of the individual's right to the free exercise of her religion.

We note that the Court specifically stated in *Sherbert, supra*, that it was not deciding a case such as this where claimant's religious convictions make her "a nonproductive member of society," using this language at page 410, 83 S.Ct. at page 1797:

"This is not a case in which an employee's religious convictions serve to make him a nonproductive member of society."

(See note 9.)

The *Sherbert* opinion was concluded with this sentence at page 410 of 374 U.S., at page 1797 of 83 S.Ct.:

"This holding but reaffirms a principle that we announced a decade and a half ago, namely that no State may 'exclude individual Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Nonbelievers, Presbyterians, or the members of any other faith, *because of their faith, or lack of it*, from receiving the benefits of public welfare legislation.' *Everson v. Board of Education*, 330 U.S. 1, 16, 67 S.Ct. 504, 512, 91 L.Ed. 711."

The Social Security Administration has previously considered the effect of *Sherbert* upon the denial of disability benefits under 20 C.F.R. § 404.1507 of the regulations. In SSR 67–61, C.B.1967, p. 118, the Administration held that *Sherbert* required the Secretary to award disability benefits to a Christian Scientist who was disabled by cataracts, which were curable, because his religious belief required him to forego surgery. After quoting the holding of *Sherbert*, the ruling stated:

"This latest expression by the Supreme Court relative to whether an individual may be denied a benefit if religious convictions preclude him from complying

with a condition of entitlement therefor, is equally applicable to this case. In *Sherbert*, supra, and in the present case the burden is the same, a denial of benefits. Further, there would appear to be no compelling national interest that would justify the infringement of a Christian Scientist's rights under the First Amendment. In this respect, too, this case parallels *Sherbert*, in which the court found no compelling State interest which would justify, in the court's view, the denial of benefits to a Seventh-Day Adventist because she refused to work on Saturday."

"Accordingly, it is *held* that disability insurance benefits cannot be denied to D, a Christian Scientist, for his failure or refusal to follow prescribed surgery for the removal of cataracts where such failure or refusal is based solely upon his practice of the teachings and tenets of his faith." (Footnote omitted.)

Thus the agency itself has apparently determined that in disability cases the balance between the government's financial interest and the individual's religious interest in declining surgery must be decided in favor of the individual's First Amendment religious rights. See also *Montgomery v. Board of Retirement*, 33 Cal.App.3d 447, 109 Cal. Rptr. 181 (1973).

█ We need not determine whether the agency's interpretation of *Sherbert* on disability cases is in fact correct, because the Social Security Administration's ruling implicates the establishment clause of the First Amendment. The establishment clause requires the government to extend the same benefits it currently extends to Christian Scientists under the *regulations to* all individuals who sincerely believe in faith healing. The Supreme Court has held that: "The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which . . . prefer one religion

the opportunity to vacate its ruling SSR 67–61, C.B.1967, p. 118, cited below, holding that Christian Scientists are entitled to disability

benefits even though their beliefs may make them nonproductive members of society.

over another." *Everson v. Board of Education*, 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947). If we are to permit Christian Scientists to have benefits which claimant is denied, we would be preferring one religion (Christian Scientists) over another religious group which believes in faith healing.[10]

The government attempts to distinguish the ruling from the case at bar by noting that faith healing is not a tenet of claimant's church, the Church of God. The import of the Secretary's argument is that an individual's belief which is not a tenet of the church in which she worships is not a belief protected by the First Amendment and thus denial of benefits to claimant would not violate the establishment clause. This presents the question of whether an individual's belief, not adopted by, but consistent with the views of, his sect, is a religious belief protected by the First Amendment.[11] The First Amendment was designed in large part to protect freedom of conscience. Note, "Toward a Constitutional Definition of Religion," 91 Harv.L.Rev. 1056, 1058 (1979). To fulfill this goal adequately, the Amendment may be read to accommodate the conscience of each individual. Merel, "The Protection of Individual Choice: A Consistent Understanding of Religion Under the First Amendment," 45 Chicago L.Rev. 805 (1978). Like the rest of the First Amendment, the free exercise clause should be sensitive to the conscience of individuals.[12] In this case there was evidence from which the ALJ could have made a finding that claimant was sincerely following her religious belief in refusing surgery.[13]

---

**10.** In *Walz v. Tax Commission*, 397 U.S. 664, 673, 90 S.Ct. 1409, 1413, 25 L.Ed.2d 697 (1970), the Supreme Court upheld the New York decision to give an exemption to churches from paying property tax, pointing out that New York "has not singled out one particular church or religious group" for the privilege. The Court's use of the term "religious group" makes clear that the First Amendment extends to more than officially organized churches.

**11.** It is noted that claimant's beliefs are ones commonly associated with fundamental Christianity, are sanctioned by her minister, and were held to be religious by the ALJ. It is clear that claimant's beliefs are religious and not secular in nature. The court is not presented with the problem of defining what types of beliefs are religious.

**12.** Cases have often emphasized the tenets of a sect in determining that an individual's claim under the free exercise clause is sincere. See *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). Such an inquiry is proper in helping to establish sincerity. However, as sincerity can be determined by other means, the mere absence of a sect supporting an individual's belief need not require a presumption that the belief is insincere. *United States v. Ballard*, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944). See also *Masjid Muhammad-D.C.C. v. Keve*, 479 F.Supp. 1311 at 1323 (D.Del.1979); *Stevens v. Berger*, 428 F.Supp. 896 (E.D.N.Y.1977).

**13.** The ALJ discussed claimant's religious beliefs, but stopped short of making a finding that her beliefs in faith healing were sincere. In reviewing the evidence, the ALJ stated that "[t]he claimant indicated at the hearing that she was reluctant to have surgery performed on her abdomen because of religious reasons." (Ap.13). Subsequently, the ALJ stated that "[t]he claimant is reluctant to undergo surgery as a result of her religious beliefs." (Ap.14). We are hesitant at this time to interpret this latter statement by the ALJ to be a finding of sincerity.

We note that there is evidence upon the record which could support a finding of sincerity in the testimony of both claimant and her minister. Claimant testified on questioning by the ALJ, *inter alia*, as follows:
"Q. Why did you not go along with this suggestion of surgery?
"A. Well the reason I didn't was because in '67 when I was so ill and the Lord raised me up, because everyone thought I would be gone, and I had been attending the doctor before then, and going and going, so I decided, well I, you know, would just leave it to the Lord, and He raised me up." (Ap.33–34). Claimant's minister testified on questioning by the ALJ, *inter alia*, as follows:
"Q. . . . does one ever go into the hospital to get assistance by surgery in the hospital even though divine healing is part of the procedure, I mean . . . ?
"(The witness, REVEREND JAMES JACKSON, having been first duly sworn, testified as follows):
"REV. JACKSON: No. Divine healing you definitely would not go to the hospital, divine healing. . . . Divine healing is, I pointed out to Wise, that if a person is willing to trust the Lord to heal him of his infirmity or ailment, that person should trust the Lord all the way. May I go on?

"Q. Sure.

"A. Divine healing would have to be without the aid of man for divine healing. This is how I have talked to Mrs. Lewis about it; now she stated that the Lord had touched her in '67, okay, so she said that she's willing to trust the Lord to take her through it, to live with it or die with it, and this is my, you know, decision with her, that she is willing to wait on the Lord for this. I'm willing to pray with her." (Ap.35–36)

Subsequently he testified as follows:

"Q. . . . But specifically, would it be reasonable for followers of the church to believe the way that Mrs. Lewis does in her particular situation?

"A. Sure.

"Q. You mentioned the fact that it's your own personal belief. I'm wondering if you could help elaborate on a little, on why—let me ask you this first: Does your church prohibit or have any religious qualifications against persons undergoing surgery or treatment by medical science?

"A. No.

"Q. Why, then, would it be reasonable for Mrs. Lewis in this case?

"A. Well, I think as she stated, that in '67, she said?

"Q. Yeah.

"A. Well, here she pointed out that the Lord had touched her during this particular time without any intervention of medical science. Now, on this basis, that what the Lord had done for her during that particular period, she's willing to trust the Lord now on, and based upon the Bible, and the Bible teaches divine healing. Okay, based upon this, I'll say she want to trust the Lord to carry on in this manner, and as the pastor, and just believing in the Bible, knowing her, I sanction this very highly.

"A. . . . Now, when you say a miracle, now like I feel that anything that a person that is a believer in the Lord, that the Lord might do for that person without the aid of man, that's a miracle. That's a miracle in itself. Now, this is what I feel Mrs. Lewis has seen here. Without medication, and the Lord traced it through prayer, and I think she said earlier—maybe not this time we was talking—that it prayer that she had in '67 that brought forth this miracle.

". . . she is also continuing on through prayer, and just waiting for the Lord to continue to work with her." (Ap.54–55)

Claimant's answers to the ambiguous questions cited by the dissent do not seem to us to require a finding of insincerity. The hearing transcript shows that the claimant repeatedly asserted religious beliefs for refusing surgery and that the hypothetical questions posed to her were difficult for her to comprehend, and gave rise to some confused answers, upon which the dissent relies. In context, those statements do not detract from the contention that claimant was motivated by religious beliefs.

"Q. Mrs. Lewis, you said earlier when Law Judge Brown was asking you questions that your religious beliefs didn't prohibit you from undergoing surgery. You have no religious feelings about not undergoing surgery?

"A. No. I feel that, like I said, I know where I came from. I know how ill I was, and I know what happened to me, and I'm not going back on God. I know what He did for me.

"Q. Do you believe that God worked a miracle on you, or something akin to a miracle?

"A. Yes, yes.

"Q. Do you believe generally that miracles are confined to biblical times, or do they exist today?

"A. They exist today. I'm a miracle myself. . . .

"Q. Let me ask you this question: If the situation arose to where you were told you had to undergo surgery, not for pressing medical reasons but that you must undergo surgery in order to have the growth in your abdomen area removed, how would you feel?

"A. I would feel just like I feel now. I would have the same decision.

"Q. You mean you would refuse then to go?

"A. Yes.

"Q. If you were made to undergo surgery, and you actually did undergo surgery, in general, do you feel that your religious beliefs would be interfered with if you were made to undergo surgery? To remove this tumor?

"A. Would my religious beliefs be interfered with?

"Q. Do you feel that they would be?

"A. No. But I also feel if I have faith to believe I think I should be entitled to that.

"Q. Let me put it to you this way: Suppose there were a law that said to correct your condition, you must undergo surgery, and that the surgery in obeying the law, and any sort of command, had you undergo surgery, and you had your, had the tumor removed, do you feel that under those circumstances that your religious beliefs would be interfered with?

"A. Would you repeat that again?

"Q. Perhaps I could come back to it. I'd like to pursue it with Reverend Jackson at this point if I could." (Ap.49–50)

We note that the surgery performed in 1960, referred to in the dissenting opinion, was seven years before claimant's "miracle healing" in 1967 which led to her 1978 testimony quoted above, and that the magistrate's report expressly does not challenge the sincerity of claimant's "personal religious belief." (15a).

The ALJ simply never addressed the question of sincerity, and in light of the evidence outlined above, we cannot agree with the dissent's

In his concurring opinion in *Abington School Dist. v. Schempp*, 374 U.S. 203, 231, 83 S.Ct. 1560, 1576, 10 L.Ed.2d 844, Mr. Justice Brennan said:

"The constitutional mandate expresses a deliberate and considered judgment that such matters are to be left to the conscience of the citizen, and declares as a basic postulate of the relation between the citizen and his government that 'the rights of conscience are, in their nature, of peculiar delicacy, and will little bear the gentlest touch of governmental hand * * *.'[2]

"[2] Representative Daniel Carroll of Maryland during debate upon the proposed Bill of Rights in the First Congress, August 15, 1789, I Annals of Cong. 730."

The Supreme Court has noted the importance of accommodating individual beliefs. In *Davis v. Beason*, 133 U.S. 333, 342, 10 S.Ct. 299, 300, 33 L.Ed. 637 (1890), the Court defined religion and spoke of the Amendment's concern for individuals:

"The term 'religion' has reference to one's view of his relations to his Creator, and to the obligations they impose of reverence for his being and character, and of obedience to his will. It is often confounded with the *cultus* or form of worship of a particular sect, but is distinguishable from the latter. The first amendment to the Constitution, in declaring that Congress shall make no law respecting the establishment of religion, or forbidding the free exercise thereof, was intended to allow every one under the jurisdiction of the United States to entertain such notions respecting his relations to his Maker and the duties they impose as may be approved by his judgment and conscience, and to exhibit his sentiments in such form of worship as he may think proper, . . . ."

Similarly, in *United States v. Ballard*, 322 U.S. 78, 87, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944), where the Court recognized an individual's claim that he was a divine messenger of God as a possible religious belief, the Court stated that the framers of the Constitution and the Bill of Rights

". . . fashioned a charter of government which envisaged the widest possible toleration of conflicting views. Man's relation to his God was made no concern of the state. He was granted the right to worship as he pleased and to answer to no man for the verity of his religious views."

In sum, we believe that the decisions of the Supreme Court of the United States adopt the view that an individual's sincere religious belief which is not a tenet of her sect is a belief protected by the First Amendment.

In the case at bar, the claimant may have been denied benefits due to her adherence to her religious beliefs. As the Secretary has held that the religious beliefs of Christian Scientists constitute "justifiable cause" for willfully declining to obtain medical treatment to cure remediable ailments, the establishment clause requires that the same protection must be afforded claimant if her religious beliefs are sincere.

In view of the state of the record, where there has been no explicit finding or conclusion on the sincerity of claimant's religious belief in faith or divine healing requiring her to refuse surgery on her abdomen (see note 13), we will vacate the district court order granting summary judgment for defendant, and remand the case to that court for entry of an order remanding the case to the Secretary of Health, Education and Welfare for further evaluation and consideration, in light of this opinion, of the disability of plaintiff under 42 U.S.C.A. § 423(d) and 20 C.F.R. § 404.1507 (1977).

ALDISERT, Circuit Judge, dissenting.

My difference with the majority tracks a narrow compass. I do not disagree with their exposition of appropriate Supreme Court teachings relating to first amendment religious beliefs. I differ with their application of these precepts to the record

assertion that claimant has failed to sustain her burden of proof as a matter of law concerning

the sincerity of her belief. This is a matter for the ALJ, as the finder of fact, subject to the Appeals Council, to determine.

in this case and to the explicit and implicit findings of the Administrative Law Judge, which, in turn, were approved by the Appeals Council.

I would not remand for an additional hearing because although the litigant was entitled to a day in court, she is not entitled to a return visit to repair her inept factual presentation. That she presented her first amendment contention at the hearing cannot be gainsaid. That the ALJ summarized her position cannot be denied: "The claimant is reluctant to undergo surgery as a result of her religious beliefs." App. at 14. I see no reason to give this litigant a second chance to prove her case.

My reading of the record convinces me that claimant failed in her burden to demonstrate that her refusal to submit to surgery was based on strongly held religious beliefs as discussed in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); *Abington School District v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); *United States v. Ballard*, 322 U.S. 78, 87, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944); and *Davis v. Beason*, 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637 (1890). Although the majority opinion deems *Sherbert v. Verner* controlling, it neglects the Court's important observation that "[n]o question has been raised in this case concerning the sincerity of appellant's religious beliefs." 374 U.S. at 399 n.1, 83 S.Ct. at 1791 n.1.

The record in this case shows that claimant failed to meet the burden of proving that her aversion to surgery rests on sincere religious beliefs. There is, for example, the testimony of claimant's minister, Reverend James Jackson, that the teachings of her particular church do not proscribe surgical procedures:

ALJ: Well, does your church, would it normally frown on Mrs. Lewis' going in for surgery?

A: No.

App. at 36. As the majority note, Maj. Op., at 79 n.12, the tenets of the sect are relevant as evidence of Mrs. Lewis' sincerity. More persuasive, however, is the claimant's own testimony. She testified that she is a member of Reverend Jackson's church, a congregation of the Church of God, App. at 35, and that she had previously submitted to gynecological surgery in 1960. Indeed, she had undergone a dilatation and curettage (D and C) procedure, one of the very procedures recommended to alleviate her present condition. *See* App. at 12. When specifically asked, on two separate occasions by her own counsel, if submitting to surgery would interfere with her religious beliefs, she answered "No":

Q. Mrs. Lewis, you said earlier when Law Judge Brown was asking you questions, that your religious beliefs didn't prohibit you from undergoing surgery. You have no religious feelings about not undergoing surgery?

A. No. I feel that, like I said, I know where I came from. I know how ill I was, and I know what happened to me, and I'm not going back on God. I know what He did for me.

App. at 49–50. Her counsel subsequently returned to this question, slightly rephrased, hoping for a more favorable answer:

Q. If you were made to undergo surgery, and you actually did undergo surgery, in general, do you feel that your religious beliefs would be interfered with if you were made to undergo surgery? To remove this tumor?

A. Would my religious beliefs be interfered with?

Q. Do you feel that they would be?

A. No. But I also feel if I have faith to believe I think I should be entitled to that.

*Id.* at 51. These statements tend to show that Mrs. Lewis' decision to forego surgery was not based on a conflict between her religion and conventional medical practice.*

---

* These questions, it bears emphasis, were put to claimant by *her* counsel. The majority refer to these questions as "hypothetical questions posed to her [that] were difficult for her to comprehend, and gave rise to some confused answers, upon which the dissent relies." Maj. Op., at 79, n.13.

On the basis of this record, I would hold that claimant failed to sustain her burden of proof to excuse compliance with 20 C.F.R. § 404.1507 (1977), and I would affirm the judgment of the district court.