[S.F. No. 24996. Nov. 10, 1988.]

LAURIE GROUARD WALKER, Petitioner, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY,
Respondent;
THE PEOPLE, Real Party in Interest.

114

**COUNSEL**

Scofield & Volk, Thomas A. Volk and Robert G. Scofield for Petitioner.

Warren Christopher, Robert C. Vanderet, Robert M. Schwartz, O'Melveny & Myers, Margaret Crosby, Alan Schlosser, Edward Chen, Paul L. Hoffman, Carol A. Sobel, Mark Rosenbaum, Mary Ann Yurkonis, David E. Mackenroth and Mackenroth, Seley & Anwyl as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, David D. Salmon and Clifford K. Thompson, Jr., Deputy Attorneys General, for Real Party in Interest.

Hassard, Bonnington, Rogers & Huber, David E. Willett and Catherine I. Hanson as Amici Curiae on behalf of Real Party in Interest.

**OPINION**

**MOSK, J.**—We consider in this case whether a prosecution for involuntary manslaughter (Pen. Code, § 192, subd. (b)) and felony child endangerment (*id.*, § 273a, subd. (1)) can be maintained against the mother of a child who died of meningitis after receiving treatment by prayer in lieu of medical attention. We conclude that the prosecution is permitted by statute as well as the free exercise and due process clauses of the state and federal Constitutions.

Defendant Laurie Grouard Walker is a member of the Church of Christ, Scientist (hereafter the Church). Her four-year-old daughter, Shauntay, fell

ill with flu-like symptoms on February 21, 1984, and four days later developed a stiff neck. Consistent with the tenets of her religion, defendant chose to treat the child's illness with prayer rather than medical care.[1] Defendant contacted an accredited Christian Science prayer practitioner who thereafter prayed for Shauntay and visited the child on two occasions. Defendant also engaged a Christian Science nurse who attended Shauntay on February 27 and again on March 6 and 8.[2] Shauntay nevertheless lost weight, grew disoriented and irritable during the last week of her illness, and died on March 9 of acute purulent meningitis after a period of heavy and irregular breathing. During the 17 days she lay ill, the child received no medical treatment.

The People charged defendant with involuntary manslaughter and felony child endangerment based on allegations that her criminal negligence proximately caused Shauntay's death. Defendant moved to dismiss the prosecution (Pen. Code, § 995) on the grounds that (1) her conduct was specifically protected by law, and (2) the statutes under which she had been charged failed to provide fair notice that her conduct was criminal. The court denied her motion.

Defendant petitioned the Court of Appeal for a writ of prohibition and a stay. (Pen. Code, § 999a.) The petition and stay request were summarily denied, and defendant petitioned for review in this court. We granted the petition and transferred the matter to the Court of Appeal with directions to issue an alternative writ of prohibition. After further briefing and oral argument, the Court of Appeal again denied defendant's petition. She thereafter filed a second petition for review in this court, which we also granted.

---

[1] Members of the Church "believe that disease is a physical manifestation of errors of the mind." (Comment, *Religious Beliefs and the Criminal Justice System: Some Problems of the Faith Healer* (1975) 8 Loyola L.A. L.Rev. 396, 397, fn. 7.) The use of medicine is believed to perpetuate such error and is therefore discouraged. (Schneider, *Christian Science and the Law: Room for Compromise?* (1965) 1 Colum. J.L. & Soc. Probs. 81, 87-88.) Nonetheless, "the Church sets up no abstract criteria for determining what diseases or injuries should be treated by prayer or other methods but, rather, leaves such questions to individual decision in concrete instances. . . . If some turn in what they think is an urgent time of need to medical treatment for themselves or their children, they are *not*—contrary to some recent charges— stigmatized by their church." (Talbot, *The Position of the Christian Science Church* (1983) 26 N.E. Med. J. 1641, 1642, italics in original.)

[2] The Church describes in an amicus curiae brief the role of Christian Science practitioners and nurses: "[Christian Science practitioners are] individuals who devote their full time to healing through prayer, or spiritual treatment. These individuals are approved for listing by the Church in *The Christian Science Journal,* after having given evidence of moral character and healing ability. Practitioners determine their own charges, usually from seven to fifteen dollars per day of treatment, and are paid by their patients. . . . The practitioner's work, however, is a religious vocation, a ministry of spiritual healing in its broadest sense. [¶] Christian Scientists may also call upon the services of a Christian Science nurse, who provides such practical care as dressing of wounds for those having spiritual treatment."

Defendant and amici curiae offer a variety of statutory and constitutional arguments in support of their claim that the prosecution of defendant under Penal Code section 192, subdivision (b) (hereafter section 192(b)), and section 273a, subdivision (1) (hereafter section 273a(1)), is barred as a matter of law. For the reasons set forth below, we reject their contentions and conclude that defendant can be prosecuted as charged.

## I. Statutory Contentions

### A. Section 270 as a complete defense to prosecution

Defendant first contends that the provisions of Penal Code section 270 (hereafter section 270) provide a complete defense to any prosecution based on her treatment of Shauntay's illness with prayer rather than medical care. Section 270 enumerates certain necessities that parents must furnish their children and imposes misdemeanor liability for the failure to do so. As enacted in 1872, the statute provided that "Every parent of any child who willfully omits, without lawful excuse, to perform any duty imposed upon him by law, to furnish necessary food, clothing, shelter, or medical attendance for such child, is guilty of a misdemeanor." (Pen. Code (1st ed. 1872) § 270.) The Legislature amended the provision in 1925 by inserting the phrase "or other remedial care" after "medical attendance." (Stats. 1925, ch. 325, § 1, p. 544.) The statute was again amended in 1976 to specify that "treatment by spiritual means through prayer alone" constitutes "other remedial care." (Stats. 1976, ch. 673, § 1, p. 1661.)[3]

1.

■ As a threshold consideration we must ascertain whether prayer treatment constitutes an acceptable substitute for medical care under the terms of section 270, as defendant contends. If it does not, then a fortiori the statute provides no defense to prosecutions under separate manslaughter and child endangerment provisions for the use of prayer in lieu of medicine. This determination hinges on whether "other remedial care," defined in section 270 to include prayer, represents an alternative to "medical attendance" or rather identifies a distinct and additional necessity that parents must provide their children.

---

[3] The statute thus reads in pertinent part: "If a parent of a minor child willfully omits, without lawful excuse, to furnish necessary clothing, food, shelter or medical attendance, or other remedial care for his or her child, he or she is guilty of a misdemeanor . . . . [¶] If a parent provides a minor with treatment by spiritual means through prayer alone in accordance with the tenets and practices of a recognized church or religious denomination, by a duly accredited practitioner thereof, such treatment shall constitute 'other remedial care', as used in this section."

In *People* v. *Arnold* (1967) 66 Cal.2d 438, 452 [58 Cal.Rptr. 115, 426 P.2d 515], we considered the contention that section 270 allows parents to provide children with "an accepted alternative to medical attendance: 'other remedial care,' namely enemas, compresses, and prayer." The case involved the appeal of a mother convicted of misdemeanor-manslaughter after unsuccessfully treating her child's illness with prayer. Although reversing on unrelated grounds, the *Arnold* court summarily rejected in dictum the defendant's interpretation of section 270, reasoning that "The phrase 'other remedial care' . . . does not sanction unorthodox substitutes for 'medical attendance'; it indicates one of the multiple necessities which the parent must provide." (*Ibid.*)

While the *Arnold* decision predates the 1976 amendment specifying that "other remedial care" includes prayer, the court's reasoning remains fatal to a defense based on treatment by spiritual means: regardless of its content, "other remedial care" constitutes "one of the multiple necessities" under *Arnold*, thus operating in addition to rather than in lieu of the responsibility to furnish medical attendance. Because the 1976 amendment "did not address the contention [in *Arnold*] that other remedial care could not act as a substitute to standard medical treatment," the Court of Appeal in the case at bar concluded that defendant's provision of prayer did not supplant her separate responsibility to furnish medical care under section 270.

Well-settled principles guide our review of the statutory analysis set forth in *Arnold* and embraced by the decision below. ■ " ' "The fundamental rule of statutory construction is that the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citations.]" ' In determining such intent, the court turns first to the words of the statute. '[W]here . . . the language is clear, there can be no room for interpretation.' " (*Regents of University of California* v. *Public Employment Relations Bd.* (1986) 41 Cal.3d 601, 607 [224 Cal.Rptr. 631, 715 P.2d 590], citations omitted.)

■ Section 270 requires that parents "furnish necessary clothing, food, shelter or medical attendance, or other remedial care . . . ." In our view, this language is sufficiently clear to reject the dictum in *Arnold* and conclude that the Legislature intended "other remedial care" to constitute a substitute for "medical attendance." We begin by noting the repetition of "or" to introduce both "medical attendance" and "other remedial care." The first use of the word, preceding "medical attendance," denotes that clothing, food, shelter, and medical attendance represent distinct necessities each of which must be provided a child; it would be superfluous if the succeeding phrase, "or other remedial care," introduced yet another necessity into the statutory scheme. ■ We have often observed that courts

should give significance to every word, phrase, and sentence of an act, and that any construction rendering certain words surplusage should be avoided. (*Palos Verdes Faculty Assn.* v. *Palos Verdes Peninsula Unified School Dist.* (1978) 21 Cal.3d 650, 659 [147 Cal.Rptr. 359, 580 P.2d 1155].) █ To give significance to the initial use of the word "or," its second use must be taken to mean that "other remedial care" operates as an alternative to the immediately preceding phrase rather than as an additional necessity appended to the entire sentence in the manner of an afterthought.

The definition of certain pivotal words in the statute bolsters this interpretation. "Remedial" is defined as "affording a remedy: intended for a remedy or for the removal or abatement of a disease or of an evil." (Webster's New Internat. Dict. (3d ed. 1961) p. 1920.) "Remedy," in turn, is defined as "something that relieves or cures a disease: a medicine or application that serves or helps to terminate disease and restore health." (*Ibid.*) Finally, "other" is defined as "not the same: different." (*Id.* at p. 1598.) When these definitions are substituted for the words of the statute, the provision penalizes parents who fail to provide "clothing, food, shelter or medical attendance, or [different] care [intended to relieve or cure a disease]." It thus is apparent that the Legislature intended "other remedial care" to represent an alternative to medical attendance under the terms of section 270.

Any doubt regarding this interpretation cannot survive examination of the legislative history of the 1976 amendment defining "other remedial care" to include prayer. When the members of the Assembly considered the amendment, contained in Assembly Bill No. 3843, 1975-1976 Regular Session, they had before them the third reading analysis of the legislation prepared by the Assembly Office of Research. The analysis stated: "Under this bill, the parents may not be liable for failing to provide for the health of the child because they choose treatment by prayer rather than common medical treatment . . . ." (Assem. Office of Research, 3d reading analysis of Assem. Bill No. 3843 (1975-1976 Reg. Sess.).) Similarly, the members of the Senate received an analysis of the legislation prepared by either the Republican or Democratic Caucus. Both caucus analyses stated that the amendment would shield from liability those parents who provide prayer in lieu of medical care for their children. (Sen. Democratic Caucus, 3d reading analysis of Assem. Bill No. 3843 (1975-1976 Reg. Sess.); Sen. Republican Caucus, 3d reading analysis of Assem. Bill No. 3843 (1975-1976 Reg. Sess.).) While these materials are not dispositive evidence of legislative intent (*Shippen* v. *Department of Motor Vehicles* (1984) 161 Cal.App.3d 1119, 1126 [208 Cal.Rptr. 13]), they are significant insofar as their contents do not contradict the plain language of the statute. (*Commodore Home Systems, Inc.* v. *Superior Court* (1982) 32 Cal.3d 211, 219 [185 Cal.Rptr.

270, 649 P.2d 912].) We accordingly conclude that section 270 exempts parents who utilize prayer treatment from the statutory requirement to furnish medical care, and overrule *People* v. *Arnold, supra,* 66 Cal.2d 438, 452, to the extent it concludes to the contrary.

2.

■ We next consider whether section 270 bars the prosecution of defendant under the manslaughter and child endangerment statutes. (§§ 192(b), 273a(1).) Again we turn to its plain language for initial guidance. Citing the statutory provision that "treatment by spiritual means through prayer alone . . . shall constitute 'other remedial care', *as used in this section"* (italics added), the Court of Appeal concluded that section 270 expressly precludes any extension of its religious exemption to other statutes. This analysis confuses the statutory limitation on the definition of "other remedial care" with a limitation on possible defenses implied by that definition.

Following the rule of the last antecedent, the phrase "as used in this section" must modify "other remedial care." (See *People* v. *Baker* (1968) 69 Cal.2d 44, 46 [69 Cal.Rptr. 595, 442 P.2d 675].) The language therefore either (1) qualifies the five earlier references to "other remedial care" in the statute, none of which mentions "treatment by spiritual means through prayer alone," or (2) distinguishes the definition of the phrase in section 270 from its use in numerous other statutes, most of which make no reference to treatment by spiritual means. (See, e.g., Code Civ. Proc., § 1209.5; Welf. & Inst. Code, §§ 305, subd. (c), 369, subds. (a)-(g), 625, subd. (c), 739, subds. (a)-(g), 11452, subd. (6), 14059; see also Stats. 1987, chs. 1353, 1485.) Neither of these qualifications on the statutory language bears on whether the *defense* implied by the definition of "other remedial care," as used in section 270, should apply to the charges against defendant under sections 192(b) an 273a(1).

Defendant conversely asserts that the plain language of section 270 requires the extension of its religious exemption to her prosecution. She focuses on the reference in the statute to the provision of *"necessary* clothing, food, shelter or medical attendance, or other remedial care . . . ." (Italics added.) Observing that "necessary" is defined, inter alia, as "absolutely required: essential, indispensable" (Webster's New Internat. Dict. (3d ed. 1961) p. 1511), she contends that there can be no circumstance involving the illness of a child in which the use of prayer in lieu of medicine is unlawful.

It is true that the statute recognizes "other remedial care" as an acceptable substitute for "medical attendance" when care is "necessary";

however, this conclusion does not address the question whether compliance with the terms of section 270 absolves defendant of liability under all other provisions of the Penal Code. ■ "When used in a statute words must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear . . . ." (*People v. Black* (1982) 32 Cal.3d 1, 5 [184 Cal.Rptr. 454, 648 P.2d 104]; *People v. Alday* (1973) 10 Cal.3d 392, 395 [110 Cal.Rptr. 617, 515 P.2d 1169].) Conduct that is legal in one statutory context thus may be actionable under separate statutes created for different legislative purposes. ■ It follows that the legality of defendant's conduct under the terms of section 270 cannot be read to create a parallel exemption from prosecution under sections 192(b) and 273a(1) unless the statutes reflect some shared legislative objective.[4] (*Milligan v. City of Laguna Beach* (1983) 34 Cal.3d 829, 835 [196 Cal.Rptr. 38, 670 P.2d 1121]; see also *People v. Caudillo* (1978) 21 Cal.3d 562, 585 [146 Cal.Rptr. 859, 580 P.2d 274]; Pen. Code, § 4.) We turn to the purpose of section 270.

"Rather than punishment of the neglectful parents, the principal statutory objectives [of section 270] are to secure support of the child and to protect the public from the burden of supporting a child who has a parent able to support him." (*People v. Sorensen* (1968) 68 Cal.2d 280, 287 [66 Cal.Rptr. 7, 437 P.2d 495, 25 A.L.R.3d 1093].) The provision is "designed to supplement civil statutes for effective enforcement of child support obligations." (Note, *Criminal Nonsupport and a Proposal for an Effective Felony-Misdemeanor Distinction* (1986) 37 Hastings L.J. 1075, 1079; *County of Ventura v. George* (1983) 149 Cal.App.3d 1012, 1015 [197 Cal.Rptr. 245].) A parent thus may comply with the requirements of the statute simply by providing financial assistance to another individual with physical custody of the child. (*Lyons v. Municipal Court* (1977) 75 Cal.App.3d 829, 843 [142 Cal.Rptr. 449].) A parent who is financially incapable of furnishing support, without fault, is likewise excused from compliance. (*People v. Sorensen, supra,* 68 Cal.2d at p. 287.) Indeed, the dispositional section of the statutory scheme explicitly contemplates protection of the fisc by stipulating that "If the children are receiving public assistance, all fines, penalties or forfeitures

---

[4]This analysis reflects the rule that different statutes should be construed together only if they stand in pari materia. "Statutes are considered to be in pari materia when they relate to the same person or thing, to the same class of person of things, or have the same purpose or object. Characterization of the object or purpose is more important than characterization of subject matter in determining whether different statutes are closely enough related to justify interpreting one in light of the other. It has been held that where the same subject is treated in several acts having different objects the statutes are not in pari materia. 'The adventitious occurrence of . . . similar subject matter, in laws enacted for wholly different ends will normally not justify applying the rule.' " (2A Sutherland, Statutory Construction (Sands, 4th ed. 1984) § 51.03, p. 467, citations and fns. omitted.) Even if statutes stand in pari materia, "each retains its independence and a violation of one is not necessarily a violation of the other." (*Id.* at p. 468.) Similarly, a defense to one is not necessarily a defense to the other.

imposed and all funds collected from the defendant [for violations of section 270 or section 270a] shall be paid to the county department. Money so paid shall be applied first to support . . . and any balance remaining shall be applied to future needs, or be treated as reimbursement for past support furnished from public assistance funds." (Pen. Code, § 270d; see *People* v. *Sorensen, supra,* 68 Cal.2d at p. 287.)

Disputing this settled understanding of section 270 as a fiscal support provision, defendant asserts that the objective of the statute is to protect children from serious injury rather than to secure certain routine necessities at parental expense.[5] She argues that her interpretation is supported by the notes of the Code Commission of 1870-1872. We will consider the code commissioners' notes when they do not conflict with other persuasive evidence of legislative intent and particularly " 'where the commission's comment is brief, because in such a situation there is ordinarily strong reason to believe that the legislators' votes were based in large measure upon the explanation of the commission proposing the bill.' " (*Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 630 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420], quoting *Van Arsdale* v. *Hollinger* (1968) 68 Cal.2d 245, 249-250 [66 Cal.Rptr. 20, 437 P.2d 508].) The explanatory note for section 270 reads: "Consult the Civil Code for the provisions reported defining the duty of parental support. As to the criminality of a willful omission to perform this duty.—See Reg. vs. Chandler [(1855) 6 Cox Crim. Cas. 519], Reg. vs. Gray [(1857) 7 Cox Crim. Cas. 326], Reg. vs. S __ [(1851) 5 Cox Crim. Cas. 279], Reg. vs. Philpot[t] [(1853) 6 Cox Crim. Cas. 140]." (Code comrs. note, Pen. Code (1st ed. 1872) p. 117.) Because the note says nothing regarding the purpose of the statute, any construction of legislative intent resting on its contents requires the implausible assumption that the legislators sought out and read the four English common law cases cited therein and then conformed their understanding of the statute to the reasoning of those opinions.

Yet even if we were to so assume, the cases fail to substantiate defendant's interpretation. She emphasizes that each involved allegations of a child suffering physical injury as a result of a parent's failure to provide basic necessities, and asserts that child endangerment was thus the harm to be

---

[5] Defendant acknowledges that the dispositional provisions of section 270d substantiate the contrary conclusion reached by this court in *Sorensen*. She maintains that section 270d should be ignored because it was added to the Penal Code after the original passage of section 270. Her contention contradicts the established principle that in construing a statute to discern its purpose, its provisions should be read together "so that all may be harmonized and have effect." (*Moore* v. *Panish* (1982) 32 Cal.3d 535, 541 [186 Cal.Rptr. 475, 652 P.2d 32].) The sequence of enactment of particular sections in a statute bears on its construction only when two provisions stand in irreconcilable conflict; in that event, the terms of the *later* prevail. (*City of Petaluma* v. *Pac. Tel. & Tel. Co.* (1955) 44 Cal.2d 284, 288 [282 P.2d 43].)

averted by imposition of criminal liability. To the contrary, the first case cited in the code commission note held that a mother could not be found guilty of neglecting to feed her child when she had lacked the financial means to do so, even though public assistance had been available to otherwise provide for the starving child. "It is admitted in the case that there was no evidence of her having the means; that being admitted, it is no answer to say that she might have procured the means by applying to the relieving officer." (*Reg.* v. *Chandler, supra,* 6 Cox Crim. Cas. at p. 520.) This disposition suggests that failure to provide financial support, rather than injury per se, was the gravamen of the common law crime. Indeed, the continued existence under section 270 of a complete defense for parents who lack without fault the means of support significantly distinguishes the misdemeanor provision from sections 192(b) and 273a(1), which recognize no insolvency exception to felony charges stemming from severe neglect.

■ We thus reaffirm our determination in *Sorensen, supra,* 68 Cal.2d 280, that section 270 requires able parents to furnish certain routine necessities for their children so that the public need not unnecessarily assume that obligation. (See also *Davis* v. *Stroud* (1942) 52 Cal.App.2d 308, 315 [126 P.2d 409].) While certainly reflecting concern for the general welfare of children, the fiscal objectives of this support provision are so manifestly distinguishable from the specific purposes of the involuntary manslaughter and felony child-endangerment statutes—designed to protect citizens from immediate and grievous bodily harm—that section 270 cannot be read to create express exemptions from prosecution under those separate provisions as a matter of parallel construction. The Legislature has determined that the provision of prayer is sufficient to avert misdemeanor liability for neglecting one's financial responsibility to furnish routine child support. This hardly compels the conclusion that in so doing the Legislature intended to create an unqualified defense to felony manslaughter and child endangerment charges for those parents who continue to furnish prayer alone in the rare instance when a gravely ill child lies dying for want of medical attention.[6]

In the absence of support from the plain language and purpose of section 270, defendant points to the legislative history of certain amendments to the

---

[6]This conclusion disposes of defendant's separate contention that both section 270 and section 273a(1) address the same object—child endangerment—and therefore that she must be charged under the provision more specifically encompassing her conduct. (See *In re Williamson* (1954) 43 Cal.2d 651, 654 [276 P.2d 593].) Because we have determined that section 270 is not intended to protect children from life-threatening bodily harm but rather focuses on the procurement of their routine support, the doctrine does not apply. (*People* v. *Jenkins* (1980) 28 Cal.3d 494, 502 [170 Cal.Rptr. 1, 620 P.2d 587].) Indeed, it would be a bizarre result if parents who starve their children nearly to death by failing to furnish food could be prosecuted for no more than a misdemeanor violation of section 270.

statute as evidence of an intent to exempt prayer treatment from the reach of sections 192(b) and 273a(1). She specifically contends that the 1925 and 1976 amendments to section 270 were enacted to bar manslaughter prosecutions against Christian Scientists. With respect to the 1925 amendment, which added the phrase "or other remedial care" to the statute, defendant rests her account of its legislative history on certain descriptive passages contained in the 1920 and 1925 annual reports of the Christian Science Committee on Publication for Southern California. She is not well served by these materials. First, the documents are so removed from the legislative process that any construction of the statute based on their contents would be patently unreliable. Second, even if we were to consider the reports, they provide virtually no support for her contention.[7]

Defendant next contends that the 1976 amendment identifying prayer treatment as a form of "other remedial care" was similarly intended to shield Christian Scientists from manslaughter prosecutions. She observes that the amendment was sponsored by the Church in response to our dictum in *Arnold,* a case involving a misdemeanor-manslaughter prosecution. While legislative materials demonstrate that the amendment was indeed sponsored by the Church in response to *Arnold,* there is no evidence that the Legislature intended the modification to affect manslaughter, as opposed to misdemeanor, liability. (See Sen. Com. on Judiciary, Analysis of Assem. Bill No. 3843 (1975-1976 Reg. Sess.); Sen. Republican Caucus, 3d reading analysis of Assem. Bill No. 3843, *supra.*) The portion of the *Arnold* opinion cited in the legislative materials as inspiring the amendment focused exclusively on the underlying misdemeanor liability of the parent; none of the documents mentions the relationship between the discussion of section 270 in *Arnold* and the manslaughter charge elsewhere involved in the case. (*Ibid.*) While the ensuing amendment necessarily precluded

---

[7]Defendant posits a causal relationship between a misdemeanor-manslaughter prosecution detailed in the 1920 report and the 1925 amendment to section 270, briefly extolled in the latter report. However, the cited passage of the 1925 report simply recites the language of the amendment and terms the legislation "a forward step . . . ." No mention is made of any relationship between the amendment and manslaughter liability in general nor the specific manslaughter prosecution discussed in the earlier report. In an attempt to forge the missing causal link, defendant disingenuously observes that in "a [misdemeanor-manslaughter] case cited in those . . . materials," a judge purportedly ruled from the bench that prayer is "a legal, lawful means of healing disease in the State of California as contemplated by Section 270 or any other section of the laws of the State of California . . . ." On the basis of this ruling, defendant concludes that the 1925 legislation had afforded "a parent who provides his/her child with treatment by prayer as an alternative to medical attendance with a complete statutory defense to *manslaughter* charges . . . ." (Italics in original.) What defendant fails to note is that the discussion of the ruling appeared in the 1920 annual report. The case therefore predated the 1925 amendment by at least five years, obviously lends nothing to its interpretation, and was flatly erroneous in light of the language of section 270 existing prior to 1925, which recognized no substitute for the provision of medical attendance. (See Pen. Code (1st ed. 1872) § 270.)

misdemeanor-manslaughter prosecutions based on violations of section 270 by eliminating misdemeanor liability under that statute, the Legislature left untouched the possibility of an involuntary manslaughter prosecution based as here on allegations of criminal negligence in the "commission of a lawful act which might produce death, in an unlawful manner . . . ." (§ 192 (b).)[8]

The historical materials documenting the enactment of Assembly Bill No. 3843 demonstrate that the members of the Legislature were well aware the legislation left open the possibility of manslaughter and child endangerment prosecutions, but simply declined to extend their amendatory efforts beyond section 270. A staff analysis prepared for the Assembly Committee on Criminal Justice observed that "The bill appears unclear in two respects. First, Section 273a makes it a wobbler (10 year top) for any person to permit a minor under his care or custody to suffer any physical harm or injury. Thus, though the parents may not be liable for failing to provide for the health of the child because they choose treatment by prayer rather than common medical treatment, they would be liable if the child suffered any physiological harm. Second, no exception is made under the manslaughter statutes for parental liability should the child die. If treatment by prayer is to be recognized in part, the parents should not be liable for the results of using a permitted mode of healing." (Assem. Com. on Criminal Justice, Analysis of Assem. Bill No. 3843 (1975-1976 Reg. Sess.).) Despite the opinion offered in the final sentence of the staff analysis, no amendments were made to eliminate potential liability under sections 192(b) and 273a(1). The committee passed the bill on April 29, 1976.

When the full Assembly considered the legislation on May 6, 1976, its members had before them the third reading analysis of the bill prepared by the Assembly Office of Research. This analysis incorporated, nearly verbatim, the observations regarding manslaughter and child endangerment liability contained in the earlier analysis prepared for the Criminal Justice Committee. (Assem. Office of Research, 3d reading analysis of Assem. Bill No. 3843, *supra*.) Again, no amendments were offered in response to the observations. The bill passed and moved to the Senate.

The Senate Committee on Judiciary received a four-page analysis of the legislation. Under the heading "Comment" and entirely capitalized, unlike

---

[8] Section 192(b) defines involuntary manslaughter as the unlawful killing of a human being without malice "in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution or circumspection." The information charging defendant with manslaughter alleges that she killed her daughter "without malice but in the commission of a lawful act which might produce death in an unlawful manner and without due caution and circumspection."

any other portion of the document, were the following questions: "Do the provisions of this bill conflict with section 273a of the Penal Code which makes it a crime for any person to willfully cause or permit a minor under his care or custody to suffer any physical harm or injury? [¶] Might a parent be immune from liability for failure to provide for the health of the child because they [*sic*] choose treatment by prayer rather than common medical treatment, but incur liability if the child suffers any harm?" (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 3843, *supra,* capitalization omitted.) As in the Assembly, the Senate committee members chose to disregard the issues raised so prominently in their staff analysis and passed the measure to the full Senate without addressing manslaughter and child endangerment liability. No other reference to sections 192(b) and 273a(1) appears in the historical materials documenting the enactment of Assembly Bill No. 3843.

The ineluctable conclusion we must draw from these materials is that the members of the Legislature were fully conscious of the potential liability remaining under sections 192(b) and 273a(1) for conduct they had legalized with respect to section 270, but simply chose to leave the matter unaddressed. Needless to say, considered silence is an insufficient basis to infer that the Legislature, by amending a misdemeanor support provision, actually exempted from felony liability all parents who offer prayer alone to a dying child. ■ "The failure of the Legislature to change the law in a particular respect when the subject is generally before it and changes in other respects are made is indicative of an intent to leave the law as it stands in the aspects not amended." (*Cole* v. *Rush* (1955) 45 Cal.2d 345, 355 [289 P.2d 450, 54 A.L.R.2d 1137], disapproved on another point in *Vesely* v. *Sager* (1971) 5 Cal.3d 153, 167 [95 Cal.Rptr. 623, 486 P.2d 151].) The plain language, purpose, and legislative history of section 270 thus fail to establish a discernible legislative intent to exempt prayer treatment, as a matter of law, from the reach of the manslaughter and felony child-endangerment statutes. (Accord, Note, *California's Prayer Healing Dilemma* (1987) 14 Hastings Const.L.Q. 395, 401-404.)

B. *Expressions of legislative intent in related statutes*

■ Defendant next contends that an intent to exempt prayer treatment from conduct within the reach of sections 192(b) and 273a(1) is implied by a number of other civil and criminal measures relating to the provision of prayer in lieu of medical care to children. She first cites a plethora of statutes exempting prayer practitioners and their facilities from medical licensure requirements[9] or variously accommodating individuals who

---

[9] See, e.g., Business and Professions Code sections 2063, 2731, and 2789; Health and Safety Code sections 430.8, 1270, 1505, subdivision (f), 1569.145, subdivision (c), 1569.31, 1709, and 1738. As we long ago observed, the exemption of spiritual practitioners from licensure

choose to rely on such treatment for their own care.[10] These accommodative provisions, however, evince no legislative sanction of prayer for the treatment of children in life-threatening circumstances.

 More useful are statutes dealing with the definition of neglected or abused children for purposes of the state's child welfare services program (Welf. & Inst. Code, § 16500 et seq.), the activities of the Office of Child Abuse Prevention (*id*. § 18950 et seq.), and a criminal provision requiring certain individuals to report instances of suspected child abuse (Pen. Code, § 11165 et seq.). Utilizing substantially similar language, each of these three statutes provides that children receiving treatment by prayer shall not "for that reason alone" be considered abused or neglected for its purposes. (Welf. & Inst. Code, §§ 16509.1 (hereafter W&I section 16509.1) and 18950.5 (hereafter W&I section 18950.5); Pen. Code, § 11165.2 (hereafter section 11165.2).) Defendant cites these provisions as evidence that the Legislature does not consider prayer treatment to be a threat to the health of children, and thus that the imposition of criminal liability for the results of its use is inconsistent with legislative intent.

The Attorney General urges a different construction of the statutory language. He contends that the phrase "for that reason *alone*" (italics added) denotes that a child receiving prayer treatment can still fall within the reach of the statutory definitions if the provision of such treatment, coupled with a grave medical condition, combine to pose a serious threat to the physical well-being of the child.[11] While defendant contends the phrase

requirements simply reflects the fact that those who rely on spiritual care understand that its effectiveness is independent of the knowledge and skills which the licensing statutes seek to assure in those who represent themselves to the public as physicians. (*People* v. *Jordan* (1916) 172 Cal. 391, 400 [156 P. 451]; see also Comment, *Religious Beliefs and the Criminal Justice System: Some Problems of the Faith Healer, supra,* 8 Loyola L.A. L.Rev. at p. 399, fn. 12.)

[10] See, e.g, Welfare and Institutions Code sections 7104, 14004, 14059, and 14132, subdivision (a); Education Code section 44978; Unemployment Insurance Code sections 2627.5, subdivision (c)(4), and 2709.

[11] The Attorney General's interpretation duplicates an earlier construction of precisely the same words offered from a surprising quarter: the Christian Science Church. The Church-sponsored legislation containing the 1976 amendment to section 270 originally included an additional amendment to section 600 (now section 300) of the Welfare and Institutions Code, which sets forth the circumstances under which children can be declared dependents of the court and taken from their parents. The amendment, deleted from the legislation prior to its passage, provided that "No child who in good faith is under treatment solely by spiritual means through prayer alone . . . shall, *for that reason alone,* be considered a person described by Section 600." (Assem. Bill No. 3843 (1975-1976 Reg. Sess.), as introduced Mar. 17, 1976, italics added.) When the Director of the Department of Health questioned whether the amendment would bar children receiving prayer treatment from being declared dependents even if their health became endangered, the Christian Science official sponsoring the legislation gave the following response in a letter dated June 16, 1976: "The general counsel for the Christian Science Committee on Publication for Southern California . . . gave us his considered opinion that [the amendment] does not preclude the court's taking custody of a

merely indicates that a child receiving prayer treatment can come within the purview of the statutes for other reasons, her construction renders the use of the word "alone" surplusage and thus must be rejected under the rule that " '[e]very word, phrase and provision employed in a statute is intended to have meaning and to perform a useful function. . . .' " (*White* v. *County of Sacramento* (1982) 31 Cal.3d 676, 681 [183 Cal.Rptr. 520, 646 P.2d 191], quoting *Clements* v. *T. R. Bechtel Co.* (1954) 43 Cal.2d 227, 233 [273 P.2d 5].)

The code section immediately preceding W&I section 16509.1 in the child welfare services chapter strongly corroborates the interpretation offered by the Attorney General. That section reads: "Cultural and religious child-rearing practices and beliefs which differ from general community standards shall not in themselves create a need for child welfare services unless the practices present a specific danger to the physical or emotional safety of the child." (Welf. & Inst. Code, § 16509 (hereafter W&I section 16509).) ▮ It is fundamental that "the language of a particular code section must be construed in light of and with reference to the language of other sections accompanying it and related to it with a view to harmonizing the several provisions and giving effect to all of them." (*Johnson* v. *Superior Court* (1984) 159 Cal.App.3d 573, 582 [205 Cal.Rptr. 605].) The provision of prayer treatment in lieu of medical care to a gravely ill child doubtless constitutes a religious child-rearing practice "which differ[s] from general community standards . . . ." Nor is there any question that W&I sections 16509 and 16509.1 are related and intended to express a unified statutory objective. To harmonize their provisions accordingly, the use of the word "alone" in W&I section 16509.1 must be construed to signify that treatment by prayer will not constitute neglect for purposes of the child welfare services chapter except in those instances when such treatment, coupled with a sufficiently grave health condition, presents "a specific danger to the physical . . . safety of the child."[12]

---

minor if the [prayer treatment] is not effective. It only says to the court that it cannot take a child into custody *for the sole reason* that he is being furnished accredited Christian Science treatment." (Italics in original.) The Church official reiterated his analysis in a letter to Senator Carpenter on the same day: "[T]he court can't take a child away from a parent *solely because* he's having accredited Christian Science treatment in lieu of medical. Of course, the bill doesn't say that the child can't be taken *if* the treatment should not be effective." (Italics in original.)

[12] The Colorado Supreme Court has reached the same conclusion with respect to nearly identical statutory language: "In our view, the meaning of the statutory language, 'for that reason alone,' is quite clear. It allows a finding of . . . neglect for other 'reasons,' such as where the child's life is in imminent danger, despite any treatment by spiritual means. In other words, a child who is treated solely by spiritual means is not, for that reason alone, . . . neglected, but if there is an additional reason, such as where the child is deprived of medical care necessary to prevent a life-endangering condition, the child may be adjudicated . . . ne-

While section 11165.2 and W&I section 18950.5 lack similar companion provisions, there are persuasive reasons why we should interpret them in the same manner. First, each employs the words "for that reason alone" in a context identical to the use of the phrase in W&I section 16509.1. Identical language appearing in separate provisions dealing with the same subject matter should be accorded the same interpretation. (*Ford Dealers Assn.* v. *Department of Motor Vehicles* (1982) 32 Cal.3d 347, 359 [185 Cal.Rptr. 453, 650 P.2d 328].) Because each statute deals with the relationship of prayer treatment to the definition of child neglect or abuse, we are obliged to construe their shared language in a consistent fashion. (*Dieckmann* v. *Superior Court* (1985) 175 Cal.App.3d 345, 356 [220 Cal.Rptr. 602].) Second, both section 11165.2 and W&I section 18950.5 explicitly refer to the language of W&I section 16509.1 to define the conduct excepted from their definitions of neglect and abuse.[13] This fact further suggests that the Legislature intended the several statutes to share a common meaning.

Finally, the most telling indication that the statutes should be construed together in the manner urged by the Attorney General is their mutual interrelation with the child dependency provisions of Welfare and Institutions Code section 300 (hereafter W&I section 300). Furnishing the state with its most powerful tool to intercede on behalf of children threatened at the hands of their parents, W&I section 300 delineates the circumstances under which a child can be removed from parental custody and declared a dependent of the court. Section 11165.2 and W&I sections 16509.1 and 18950.5 are each components of separate acts connected in some significant fashion to the child dependency proceedings outlined in W&I section 300. In sum, the three acts (1) require that suspected instances of child abuse or neglect be reported to the agency responsible for initiating child dependency proceedings under W&I section 300 (Pen. Code, § 11166, subds. (a), (b), & (g)); (2) provide services to neglected or abused children identified through dependency proceedings (Welf. & Inst. Code, §§ 16506, subd. (a), 16507, 16508, subd. (a)); and (3) fund child-abuse prevention projects in cooperation with local welfare agencies responsible for supervising dependency

---

glected under the statutory scheme." (*People In Interest of D.L.E.* (Colo. 1982) 645 P.2d 271, 274-275.)

[13] W&I section 18950.5 reads: "For the purposes of . . . [the Office of Child Abuse Prevention] chapter, a child receiving treatment by spiritual means as provided in [section 16509.1] of the Welfare and Institutions Code shall not for that reason alone be considered an abused or neglected child." (W&I section 18950.5 actually cites former section 16508 of the Welfare and Institutions Code, where the language of W&I section 16509.1 was previously codified in nearly identical terms prior to a 1982 amendment that renumbered the provisions of the child welfare services chapter. (Stats. 1982, ch. 978, § 62.) The reference in W&I section 18950.5 to the superseded code section was apparently overlooked at the time of the 1982 amendment.)

Section 11165.2 reads in pertinent part: "For the purposes of this chapter, a child receiving treatment by spiritual means as provided in Section 16509.1 of the Welfare and Institutions Code . . . shall not for that reason alone be considered a neglected child."

proceedings (Welf. & Inst. Code, § 18964, subd. (f)(3)). This intimate interrelation of statutory objectives, revolving around the identification and enforcement provisions of W&I section 300, counsels us to interpret the language of the related acts with reference to the provisions of the dependency statute to "achieve a uniform and consistent legislative purpose." (*Isobe* v. *Unemployment Insurance Appeals Bd.* (1974) 12 Cal.3d 584, 591 [116 Cal.Rptr. 376, 526 P.2d 528]; *People* v. *Caudillo, supra,* 21 Cal.3d 562, 585.)

On September 30, 1987, the Governor signed into law Senate Bill No. 243, 1987-1988 Regular Session, which revised W&I section 300 in its entirety. (Stats. 1987, ch. 1485, § 4 [No. 5 Deering's Adv. Legis. Service, pp. 5779-5780].) Although the legislation will not take effect until January 1, 1989, its provisions dealing with the relationship of prayer treatment to dependency proceedings are critically significant to our interpretive task insofar as they represent the Legislature's most recent and detailed articulation of the protection to be assured seriously ill children receiving such care.

Newly amended W&I section 300 provides in pertinent part: "Any minor who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court. . . . [¶] (b) The minor has suffered, or there is substantial risk that the minor will suffer, serious physical harm or illness, . . . by the willful or negligent failure of the parent . . . to provide the minor with adequate food, clothing, shelter, or medical treatment. . . . Whenever it is alleged that a minor comes within the jurisdiction of the court on the basis of the parent's . . . willful failure to provide adequate medical treatment or specific decision to provide spiritual treatment through prayer, the court shall give deference to the parent's . . . medical treatment, nontreatment, or spiritual treatment through prayer alone in accordance with the tenets and practices of a recognized church or religious denomination by an accredited practitioner thereof and shall not assume jurisdiction *unless necessary to protect the minor from suffering serious physical harm or illness.*" (Italics added.)

Thus in any circumstance involving the threat of "serious physical harm or illness," the Legislature has empowered the juvenile court to intercede and assume custody for the express purpose of assuring medical care for a child whose parent is furnishing spiritual treatment by prayer alone. The expression of legislative intent is clear: when a child's health is seriously jeopardized, the right of a parent to rely exclusively on prayer must yield. This intent is implicit in the enumeration of necessities a parent must furnish to avert a dependency proceeding under W&I section 300; conspicuously absent from the list is any substitute for adequate medical treatment.

It follows that the only tenable construction of the related provisions defining the relationship of prayer treatment to child neglect or abuse is the analysis offered by the Attorney General.

While dependency proceedings are civil rather than criminal, their relevance to our inquiry is plain. Parents possess a profound interest in the custody of their children. (*In re Carmaleta B.* (1978) 21 Cal.3d 482, 489 [146 Cal.Rptr. 623, 579 P.2d 514]; *Holt v. Superior Court* (1960) 186 Cal.App.2d 524, 526-527 [9 Cal.Rptr. 353].) "Custody embraces the sum of parental rights with respect to the rearing of a child, including its care. It includes . . . the right to direct his activities and make decisions regarding his care and control, education, health, and religion." (*Burge v. City & County of San Francisco* (1953) 41 Cal.2d 608, 617 [262 P.2d 6].) The United States Supreme Court has termed this constellation of parental interests "essential" (*Meyers v. Nebraska* (1923) 262 U.S. 390, 399 [67 L.Ed. 1042, 1045, 43 S.Ct. 625, 29 A.L.R. 1446]), among the "basic civil rights of man" (*Skinner v. Oklahoma* (1942) 316 U.S. 535, 541 [86 L.Ed. 1655, 1660, 62 S.Ct. 1110]), and "[r]ights far more precious . . . than property rights" (*May v. Anderson* (1953) 345 U.S. 528, 533 [97 L.Ed. 1221, 1226, 73 S.Ct. 840]). Consistent with the gravity of the prerogative at stake, parents involved in W&I section 300 proceedings are assured notice and a due process hearing (*In re Robert P.* (1976) 61 Cal.App.3d 310, 318 [132 Cal.Rptr. 5]) while those who are indigent receive appointed counsel (*In re Christina H.* (1986) 182 Cal.App.3d 47, 49 [227 Cal.Rptr. 41]; Cal. Rules of Court, rules 1334(c), 1363(c)). The Legislature's willingness to intrude on a parental interest of such magnitude to assure that children receiving prayer treatment are spared serious physical harm certainly evinces no contrary intent with respect to the application of the penal laws, which in significant respects constitute a less intrusive method of advancing the state's paramount interest in the protection of its children.

Defendant's argument by analogy to civil neglect and dependency provisions therefore corroborates rather than refutes our previous determination that the Legislature has created no exemption under sections 192(b) and 273a(1) for parents who are charged with having killed or endangered the lives of their seriously ill children by providing prayer alone in lieu of medical care. The legislative design appears consistent: prayer treatment will be accommodated as an acceptable means of attending to the needs of a child only insofar as serious physical harm or illness is not at risk. When a child's life is placed in danger, we discern no intent to shield parents from the chastening prospect of felony liability.

C. *Defendant's conduct and the standard for criminal culpability*

Taking a wholly different tack, defendant next contends that she cannot be convicted under either the manslaughter or felony child-endangerment

statutes regardless of the availability of a religious exemption. She rests this contention on a claim that the People will be unable to prove the degree of culpability necessary to convict her under either provision, both of which require criminal negligence in the commission of an offending act. (*People* v. *Penny* (1955) 44 Cal.2d 861, 879 [285 P.2d 926]; *People* v. *Peabody* (1975) 46 Cal.App.3d 43, 47 [119 Cal.Rptr. 780].) ■■■ We have defined criminal negligence as " 'aggravated, culpable, gross, or reckless, that is, the conduct of the accused must be such a departure from what would be the conduct of an ordinarily prudent or careful man under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard of human life or an indifference to consequences. . . . [Such negligence] is ordinarily to be determined pursuant to the general principles of negligence, the fundamental of which is knowledge, actual or imputed, that the act of the slayer tended to endanger life.' " (*People* v. *Penny, supra,* 44 Cal.2d at pp. 879-880.) Defendant makes two arguments for the claim that her conduct cannot, as a matter of law, constitute such negligence.

She first contends that the defenses recognized at English common law are available to her under Civil Code section 22.2, which reads: "The common law of England, so far as it is not repugnant to or inconsistent with the Constitution of the United States, or the Constitution or laws of this State, is the rule of decision in all the courts of this State." She cites two English cases from the 19th century in support of the proposition that the common law recognized treatment by prayer in lieu of medicine as legally insufficient to constitute criminal negligence.[14] ■■■ While we note that common law defenses, with limited exceptions, are unavailable in California (*Keeler* v. *Superior Court, supra,* 2 Cal.3d at pp. 631-632), we need look no further than the cases themselves to dispose of defendant's contention.

The opinion of the court in *Regina* v. *Wagstaffe* (Cen.Crim.Ct. 1868) 10 Cox. Crim. Cas. 530, consists of a vaguely worded jury charge. The court instructed the jury that criminal negligence "was a very wide question. . . . At different times people had come to different conclusions as to what might be done with a sick person. . . . [A] man might be convicted of manslaughter because he lived in a place where all the community was of a contrary opinion, and in another he might be acquitted because they were all of his opinion. . . ." (*Id.* at p. 532.) The court asked rhetorically wheth-

---

[14] Although more than a century old, the cases represent the last word of the English courts on the common law question of criminal negligence in such circumstances. Parliament thereafter passed the Poor Law Amendment Act of 1868 imposing a statutory duty on parents to provide their children with medical care. (Trescher & O'Neill, *Medical Care for Dependent Children: Manslaughter Liability of the Christian Scientist* (1960) 109 U. Pa. L.Rev. 203, 206-207.)

er it was "intended by God Almighty that persons should content themselves by praying for His assistance, without helping themselves, or resorting to such means as were within their reach for that purpose?" (*ibid.*), and concluded with the observation that the defendants appeared sincere and affectionate. Although the defendants were subsequently acquitted, the fact that the jury itself resolved the question of criminal negligence negates the claim that the court in *Wagstaffe* recognized a legal defense to the charge. Furthermore, its jury instructions merely restated the principle that criminal negligence is a question of fact to be determined in light of contemporary community standards, which at the time made the particular question a close one.

The second case cited by defendant makes this point quite clearly. In *Regina* v. *Hines* (1874) 80 Cent. Crim. Ct. 309, the court dismissed an indictment for manslaughter against a parent who had exclusively prayed for an ill child.[15] Although the court ruled that the conduct was not criminally negligent as a matter of law, to state the holding is to refute its application 114 years later: the court considered and rejected the proposition that a parent who treated a child by spiritual care "instead of calling in a doctor to apply blisters, leeches, and calomel," was guilty of criminal negligence. (*Id.* at p. 312.) Were blisters, leeches and calomel the medical alternative to prayer today, quite likely defendant's reliance on *Hines* would more fully resonate with this court. Medical science has advanced dramatically, however, and we may fairly presume that the community standard for criminal negligence has changed accordingly. Nineteenth-century English common law thus fails to establish a defense, as a matter of law, to charges arising today for criminal negligence in the death of a child treated by prayer alone.[16]

■ Defendant next contends that her actions are legally insufficient to constitute criminal negligence under the definition of that conduct established in the decisions of this court. Emphasizing her sincere concern and good faith in treating Shauntay with prayer, she claims that her conduct is incompatible with the required degree of culpability. Defendant does not dispute, however, that criminal negligence must be evaluated objectively. (*People* v. *Watson* (1981) 30 Cal.3d 290, 296-297 [17 Cal.Rptr. 43, 637 P.2d 279]; *People* v. *Penny, supra,* 44 Cal.2d 861, 880.) The question is whether

---

[15] While this decision postdates the passage of the Poor Law Amendment Act of 1868, the court apparently disregarded the statute and applied common law principles. (Trescher & O'Neill, *op. cit. supra,* 109 U. Pa. L.Rev. at p. 206.)

[16] We note that in the one other English case apparently decided under the common law, a parent was convicted of unlawfully neglecting to provide medical aid after praying for an ailing child. (*Reg.* v. *Hurry* (1872) 76 Cent. Crim. Ct. 63; see Trescher & O'Neill, *op. cit. supra,* 109 U. Pa. L.Rev. at p. 206, fn. 16.)

"a reasonable person in defendant's position would have been aware of the risk involved . . . ." (*People* v. *Watson, supra,* 30 Cal.3d at p. 296.) If so, "defendant is presumed to have had such an awareness." (*Ibid.*)

The significance of this principle was well illustrated in *People* v. *Burroughs* (1984) 35 Cal.3d 824 [201 Cal.Rptr. 319, 678 P.2d 894], a case involving a "self-styled 'healer' " who provided " 'deep' abdominal massages" to a leukemic who thereafter died of a massive abdominal hemorrhage. (*Id.* at pp. 826, 828.) We observed that "There is no allegation made, nor was there any evidence adduced at trial, that [the defendant] at any time harbored any intent even to harm [the victim] in the slightest fashion." (*Id.* at p. 834.) "Indeed, nowhere is it claimed that defendant attempted to perform any action with respect to [the victim] other than to heal him . . . ." (*Id.* at p. 833.) Nonetheless, we determined that the defendant could be charged with criminally negligent involuntary manslaughter. (*Id.* at p. 836.) The relevant inquiry, then, turns not on defendant's subjective intent to heal her daughter but on the objective reasonableness of her course of conduct.[17]

In view of this standard, we must reject defendant's assertion that no reasonable jury could characterize her conduct as criminally negligent for purposes of sections 192(b) and 273a(1). As the court in *People* v. *Atkins* (1975) 53 Cal.App.3d 348 [125 Cal.Rptr. 855], observed in affirming the involuntary manslaughter and felony child-endangerment conviction of a parent whose child died for want of medical care, criminal negligence "could have been found to have consisted of the [mother's] failure to seek prompt medical attention for [her son], rather than waiting several days. There is evidence she knew, or should have known, that [her son] was seriously injured. . . . Viewing [the evidence] in the light most favorable to the prosecution, there is substantial evidence here of involuntary manslaughter based on the lack of due caution and circumspection in omitting to take the child to a doctor." (*Id.* at p. 360.) When divorced of her subjective intent, the alleged conduct of defendant here is essentially indistinguishable.

Defendant's arguments to the contrary are not persuasive. She first asserts that the various statutory exemptions enacted for Christian Scientists demonstrate a legislative acceptance of the reasonableness of their spiritual care that is incompatible with a finding of "gross, culpable, or reckless"

---

[17] Compare LaFave and Scott's comment that "an honest belief that prayer is a better cure than medicine, that Providence can heal better than doctors, might serve to negative the awareness of risk which is required for manslaughter in those states which use a *subjective* test of criminal negligence." (LaFave & Scott, Criminal Law (1972) p. 590, fn. 23, italics added.)

negligence. As discussed at length above, however, California's statutory scheme reflects not an endorsement of the efficacy or reasonableness of prayer treatment for children battling life-threatening diseases but rather a willingness to accommodate religious practice when children do not face serious physical harm. Indeed, the relevant statute suggest that prayer treatment for gravely ill children is sufficiently *unreasonable* to justify the state in taking the draconian step of depriving parents of their rights of custody. (*Ante,* at pp. 132-134.)

The two cases cited by defendant in support of her claim are clearly distinguishable. In *People* v. *Rodriguez* (1960) 186 Cal.App.2d 433 [8 Cal.Rptr. 863], the court reversed the involuntary manslaughter conviction of a mother who had left her children alone at home where one died in a fire. The court ruled that the mother's conduct did not reflect a course of conduct sufficiently reckless to justify a finding of criminal negligence. (*Id.* at pp. 440-441.) In terms of unreasonableness, however, the failure of defendant to seek medical attention for a child who sickened and died over a 17-day period is plainly more egregious than the decision of Mrs. Rodriguez to leave her children alone at home for an afternoon. In *Somers* v. *Superior Court* (1973) 32 Cal.App.3d 961 [108 Cal.Rptr. 630], the court granted a writ of prohibition barring the manslaughter prosecution of a police officer who had shot a fleeing youth whom the officer mistook for a felon. The court observed that the situation was "tense and menacing" because of earlier reports of robberies in the vicinity, that the victim matched the description of a suspect and appeared to be carrying a shotgun, and that the victim continued to flee after the officer had shouted "Stop, police." (*Id.* at pp. 965, 968-970.) Again, the objective unreasonableness of defendant's course of conduct, compared with the officer's actions in *Somers,* is of an evidently greater magnitude.

In sum, we reject the proposition that the provision of prayer alone to a seriously ill child cannot constitute criminal negligence as a matter of law. Whether this defendant's particular conduct was sufficiently culpable to justify conviction of involuntary manslaughter and felony child endangerment remains a question in the exclusive province of the jury.

## II. *Constitutional Defenses*

### A. *Free exercise under the First Amendment*

In the absence of a statutory basis to bar defendant's prosecution, we necessarily reach her constitutional claims. Defendant and the Church first contend that her conduct is absolutely protected from criminal

liability by the First Amendment to the United States Constitution and article I, section 4, of the California Constitution. We do not agree.

 The First Amendment bars government from "prohibiting the free exercise" of religion. Although the clause absolutely protects religious belief, religiously motivated conduct "remains subject to regulation for the protection of society." (*Cantwell* v. *Connecticut* (1940) 310 U.S. 296, 303-304 [84 L.Ed. 1213, 1218, 60 S.Ct. 900, 128 A.L.R. 1352].) To determine whether governmental regulation of religious conduct is violative of the First Amendment, the gravity of the state's interest must be balanced against the severity of the religious imposition. (*Wisconsin* v. *Yoder* (1972) 406 U.S. 205, 221 [32 L.Ed.2d 15, 28, 92 S.Ct. 1526].) If the regulation is justified in view of the balanced interests at stake, the free exercise clause requires that the policy additionally represent the least restrictive alternative available to adequately advance the state's objectives. (*Thomas* v. *Review Bd., Ind. Empl. Sec. Div.* (1981) 450 U.S. 707, 718 [67 L.Ed.2d 624, 634, 101 S.Ct. 1425].)

 Defendant does not dispute the gravity of the governmental interest involved in this case, as well she should not. Imposition of felony liability for endangering or killing an ill child by failing to provide medical care furthers an interest of unparalleled significance: the protection of the very lives of California's children, upon whose "healthy, well-rounded growth . . . into full maturity as citizens" our "democratic society rests, for its continuance . . . ." (*Prince* v. *Massachusetts* (1944) 321 U.S. 158, 168 [88 L.Ed. 645, 653, 64 S.Ct. 438].) Balanced against this interest is a religious infringement of significant dimensions. Defendant unquestionably relied on prayer treatment as an article of genuine faith, the restriction of which would seriously impinge on the practice of her religion. We note, however, that resort to medicine does not constitute "sin" for a Christian Scientist (Schneider, *Christian Science and the Law: Room for Compromise?, supra,* 1 Colum. J.L. & Soc. Probs. at pp. 87-88), does not subject a church member to stigmatization (Talbot, *The Position of the Christian Science Church, supra,* 26 N.E. Med. J. at p. 1642), does not result in divine retribution (Schneider, *op. cit. supra,* at pp. 87-88), and, according to the Church's amicus curiae brief, is not a matter of church compulsion.

Regardless of the severity of the religious imposition, the governmental interest is plainly adequate to justify its restrictive effect. As the United States Supreme Court stated in *Prince* v. *Massachusetts, supra,* 321 U.S. at page 170 [88 L.Ed. at p. 654], "Parents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full legal discretion when they can make that choice for themselves." The court

in *Prince* considered a free-exercise claim asserted by parents whose religious beliefs required that their children sell religious tracts in violation of child labor laws. If parents are not at liberty to "martyr" children by taking their labor, it follows a fortiori that they are not at liberty to martyr children by taking their very lives. As the court explained, "The right to practice religion freely does not include liberty to expose the community or child to communicable disease or the latter to ill health or death." (*Id.* at pp. 166-167 [88 L.Ed. at p. 653]; accord, *Wisconsin* v. *Yoder, supra,* 406 U.S. at pp. 233-234 [32 L.Ed.2d at p. 35].)

In an attempt to avoid this inexorable conclusion, the Church argues at length over the purportedly pivotal distinction between the governmental compulsion of a religiously objectionable act and the governmental prohibition of a religiously motivated act. Accepting arguendo the force of the distinction, we find that it has no relevance in a case involving an interest of this magnitude. As the court in *Prince* recognized, parents have *no* right to free exercise of religion at the price of a child's life, regardless of the prohibitive or compulsive nature of the governmental infringement. Furthermore, the United States Supreme Court has specifically sustained the compulsion of religiously prohibited conduct for interests no more compelling than here implicated. In *Jacobson* v. *Massachusetts* (1905) 197 U.S. 11, 39 [49 L.Ed. 643, 655, 25 S.Ct. 358], the court upheld a law compelling the vaccination of children for communicable diseases in the face of parental religious objections. In *United States* v. *Lee* (1982) 455 U.S. 252, 261 [71 L.Ed.2d 127, 135, 102 S.Ct. 1051], the court upheld a law requiring that the Amish violate the tenets of their faith by participating in the Social Security system. And in *Gillette* v. *United States* (1971) 401 U.S. 437, 462 [28 L. Ed.2d 168, 188, 91 S. Ct. 828], the court upheld the government's right to compel certain conscientious objectors to make war despite the religious character of their objections. We see no basis in these precedents for the conclusion that parents may constitutionally insulate themselves from state compulsion so long as their life-threatening religious conduct takes the form of an omission rather than an act.

The imposition of felony liability for failure to seek medical care for a seriously ill child is thus justified by a compelling state interest. To survive a First Amendment challenge, however, the policy must also represent the least restrictive alternative available to the state. Defendant and the Church argue that civil dependency proceedings advance the governmental interest in a far less intrusive manner. This is not evident. First, we have already observed the profoundly intrusive nature of such proceedings; it is not clear that parents would prefer to lose custody of their children pursuant to a disruptive and invasive judicial inquiry than to face privately the prospect of criminal liability. Second, child dependency proceedings advance the

governmental interest only when the state learns of a child's illness in time to take protective measures, which quite likely will be the exception rather than the rule: "Under ordinary circumstances, . . . the case of a true believer in faith healing will not even come to the attention of the authorities, unless and until someone dies." (Comment, *Religious Beliefs and the Criminal Justice System: Some Problems of the Faith Healer, supra,* 8 Loyola L.A. L.Rev. at pp. 403-404.) Finally, the imposition of criminal liability is reserved for the actual loss or endangerment of a child's life and thus is narrowly tailored to those instances when governmental intrusion is absolutely compelled.

We conclude that an adequately effective and less restrictive alternative is not available to further the state's compelling interest in assuring the provision of medical care to gravely ill children whose parents refuse such treatment on religious grounds. Accordingly, the First Amendment and its California equivalent do not bar defendant's criminal prosecution. (Accord, *Craig* v. *State* (1959) 220 Md. 590 [155 A.2d 684, 690]; *People* v. *Pierson* (1903) 176 N.Y. 201 [68 N.E. 243, 245]; *Owens* v. *State* (1911) 6 Okla.Crim. 110 [116 P. 345, 347-348]; *Commonwealth* v. *Barnhart* (1985) 345 Pa.Super. 10 [497 A.2d 616, 623-624]; Note, *California's Prayer Healing Dilemma, supra,* 14 Hastings Const.L.Q. at pp. 412.)

B. *Due process right to fair notice of illegal conduct*

██ Article I, section 7, of the California Constitution and the Fourteenth Amendment to the United States Constitution both assure that no person shall be deprived of "life, liberty, or property without due process of law." Among the implications of this constitutional command is that the state must give its citizenry fair notice of potentially criminal conduct. This requirement has two components: "due process requires a statute to be definite enough to provide (1) a standard of conduct for those whose activities are proscribed and (2) a standard for police enforcement and for ascertainment of guilt." (*Burg* v. *Municipal Court* (1983) 35 Cal.3d 257, 269 [198 Cal.Rptr. 145, 673 P.2d 732], cert. den. 466 U.S. 967 [80 L.Ed.2d 812, 104 S.Ct. 2337]; see also *Kolender* v. *Lawson* (1983) 461 U.S. 352, 357-358 [75 L.Ed.2d 903, 908-909, 103 S.Ct. 1855].) ██ Defendant contends that sections 192(b) and 273a(1), when read together with section 270, violate this constitutional dictate.

We initially observe that these statutes do not invite standardless law enforcement. Unlike typical due process challenges involving an ambiguously worded statute applied in an arbitrary and unforeseeable manner (see, e.g., *Lanzetta* v. *New Jersey* (1939) 306 U.S. 451 [83 L.Ed. 888, 59 S.Ct. 618]), we consider here three separate provisions that clearly identify their

respective proscriptions. (*People* v. *Harris* (1966) 239 Cal.App.2d 393, 395-397 [48 Cal.Rptr. 677] [upholding the validity of § 273a on fair notice grounds]; *People* v. *Wilson* (1947) 78 Cal.App.2d 108, 114 [177 P.2d 567] [same, § 192(b)]; *People* v. *Yates* (1931) 114 Cal.App.Supp. 782, 789 [298 P. 961] [same, § 270].) Even if we accept arguendo defendant's contention that the intersection of the statutes creates uncertainty on the part of law enforcement officials regarding the legality of prayer treatment when a child's life is endangered or lost, the officials are nevertheless required to make only one discretionary judgment: whether or not to prosecute conduct otherwise within the reach of the felony statutes in view of the provisions of section 270. This discretion certainly is not "of such a standardless sweep [that it] allows policemen, prosecutors, and juries to pursue their personal predilections." (*Smith* v. *Goguen* (1974) 415 U.S. 566, 575 [39 L.Ed.2d 605, 613, 94 S.Ct. 1242].)

With respect to the remaining component of the due process analysis, defendant makes two arguments why the statutory scheme fails to provide fair notice. She first contends that sections 192(b) and 273a(1) provide no notice of the point at which lawful prayer treatment becomes unlawful, thus requiring her "at peril of life, liberty or property to speculate as to the meaning of penal statutes." (*Lanzetta* v. *New Jersey, supra,* 306 U.S. at p. 453 [83 L.Ed. at p. 890].) She frames her argument in the form of a rhetorical question: "Is it lawful for a parent to rely solely on treatment by spiritual means through prayer for the care of his/her ill child during the first few days of sickness but not for the fourth or fifth day?" Justice Holmes correctly answers: "[T]he law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. . . . 'An act causing death may be murder, manslaughter, or misadventure, according to the degree of danger attending it' by common experience in the circumstances known to the actor." (*Nash* v. *United States* (1913) 229 U.S. 373, 377 [57 L.Ed. 1232, 1235, 33 S.Ct. 780]; see also *Coates* v. *City of Cincinnati* (1971) 402 U.S. 611, 614 [29 L.Ed.2d 214, 217, 91 S.Ct. 1686].) The "matter of degree" that persons relying on prayer treatment must estimate rightly is the point at which their course of conduct becomes criminally negligent. In terms of notice, due process requires no more. (*Burg* v. *Municipal Court, supra,* 35 Cal.3d at p. 270.)

Defendant contends in conclusion that the statutory scheme violates her right to fair notice by allowing punishment under sections 192(b) and 273a(1) for the same conduct that is assertedly accommodated under section 270. ■ ■ ■ ■ She argues in essence that the statutes issue "inexplicably contradictory commands" (*Raley* v. *Ohio* (1959) 360 U.S. 423, 438 [3 L.Ed.2d 1344, 1356, 79 S.Ct. 1257]) and thus violate due process by precluding "an ordinary person [from] intelligently choos[ing],

in advance, what course it is lawful for him to pursue." (*Connally* v. *General Construction Co.* (1926) 269 U.S. 385, 393 [70 L.Ed. 322, 329, 46 S.Ct. 126].)[18]

■ In considering whether a legislative proscription is sufficiently clear to satisfy the requirements of fair notice, "we look first to the language of the statute, then to its legislative history, and finally.to California decisions construing the statutory language." (*Pryor* v. *Municipal Court* (1979) 25 Cal.3d 238, 246 [158 Cal.Rptr. 330, 599 P.2d 636]; *People* v. *Mirmirani* (1981) 30 Cal.3d 375, 383 [178 Cal.Rptr. 792, 636 P.2d 1130].) We thus require citizens to apprise themselves not only of statutory language but also of legislative history, subsequent judicial construction, and underlying legislative purposes (*People* v. *Grubb* (1965) 63 Cal.2d 614, 620 [47 Cal.Rptr. 772, 408 P.2d 100]). (See generally Amsterdam, *The Void-For-Vagueness Doctrine in the Supreme Court* (1960) 109 U. Pa. L.Rev. 67.) These principles express the strong presumption that legislative enactments "must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears. [Citations.] A statute should be sufficiently certain so that a person may know what is prohibited thereby and what may be done without violating its provisions, but it cannot be held void for uncertainty if any reasonable and practical construction can be given to its language." (*Lockheed Aircraft Corp.* v. *Superior Court* (1946) 28 Cal.2d 481, 484 [171 P.2d 21, 166 A.L.R. 701], citations omitted.)

■ As we have discussed at length above, the purposes of the statutes here at issue are evidently distinguishable: sections 192(b) and 273a(1)

---

[18] The Attorney General contends that we should analyze this question under the "reasonable reliance" doctrine rather than as a traditional fair-notice issue. Unlike fair notice, which addresses the validity and enforceability of a statute, "reasonable reliance" is an exception to the rule that ignorance of the law is no excuse. (*Kratz* v. *Kratz* (E.D.Pa. 1979) 477 F.Supp. 463, 480.) It focuses on those circumstances in which an individual acts "in reasonable reliance upon an official statement of the law, afterward determined to be invalid or erroneous," and is then prosecuted for a violation of the law. (Model Pen. Code, § 2.04, subd. (3)(b).) Unlike a fair-notice defense, the reasonable reliance doctrine requires proof of actual reliance on a mistaken construction of the statute. (Cf. *McBoyle* v. *United States* (1931) 283 U.S. 25, 27 [75 L.Ed. 816, 818, 51 S.Ct. 340].)

The issue before us is clearly of a different sort. Section 270 is not an erroneous statement or interpretation of sections 273a(1) and 192(b); it is a separate statute with full legal force and effect. The significance of this distinction is borne out by the cases analyzed under the reasonable reliance doctrine. (Compare *Raley* v. *Ohio, supra,* 360 U.S. 423, *Cox* v. *Louisiana* (1965) 379 U.S. 559 [13 L.Ed.2d 487, 85 S.Ct. 476], and *United States* v. *Lichenstein* (5th Cir. 1980) 610 F.2d 1272 [statements of public officials misrepresenting applicable law analyzed under reasonable reliance doctrine] with *United States* v. *Cardiff* (1952) 344 U.S. 174 [97 L.Ed. 200, 73 S.Ct. 189], and *Mid-Fla Coin Exchange, Inc.* v. *Griffin* (M.D.Fla. 1981) 529 F.Supp. 1006 [conflicting statutory provisions analyzed under fair-notice doctrine].) There is a distinction of constitutional dimension between an official statement of the law and the law itself. The former, if erroneous and actually relied upon, may constitute an affirmative factual defense; the latter, if "inexplicably contradictory," violates fair notice and as a matter of law cannot form the basis for criminal liability.

protect against grievous and immediate physical harm while section 270 assures the routine provision of child support at parental expense. (*Ante,* at pp. 124-126.) In light of these distinguishable objectives, it cannot be said that the legality of defendant's conduct under section 270 constitutes an "inexplicably contradictory command" with respect to the separate requirements of sections 192(b) and 273a(1). Indeed, the legislative history of section 270 specifically demonstrates the Legislature's unwillingness to extend the statute's religious exemption to the felony provisions. (*Ante,* at pp. 127-129.) Sections 270, 192(b), and 273a(1) thus provided constitutionally sufficient notice to defendant that the provision of prayer alone to her daughter would be accommodated only insofar as the child was not threatened with serious physical harm or illness.[19]

### III. *Disposition*

We conclude that the prosecution of defendant for involuntary manslaughter and felony child endangerment violates neither statutory law nor the California or federal Constitution. The judgment of the Court of Appeal is affirmed.

Lucas, C. J., Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

**MOSK, J.,** Concurring—My opinion prepared for the court holds as a matter of statutory construction that Penal Code section 270 (hereafter section 270) provides no religious defense to charges arising under the manslaughter and felony child-endangerment statutes. Because of this holding, the majority chose not to reach the Attorney General's separate contention that an extension of section 270's religious exemption to this felony prosecution would import into the proceeding a defense that offends the establishment clauses of the state and federal Constitutions. The issue, however, has been timely raised and thoroughly briefed, and its importance is manifest. I believe we should address it in this case for the guidance of the Legislature, so that any further legislative efforts to accommodate religious

---

[19] The American Civil Liberties Union argues in an amicus curiae brief that these allegedly conflicting statutes warrant particularly close scrutiny because they impinge on conduct protected by the First Amendment. Amicus curiae cites authority supporting the proposition that vague laws which chill protected expression are a cause for serious concern. (See, e.g., *Grayned* v. *City of Rockford* (1972) 408 U.S. 104, 109 [33 L.Ed.2d 222, 228, 92 S.Ct. 2294]; *Smith* v. *California* (1959) 361 U.S. 147, 150-151 [4 L.Ed.2d 205, 209-210, 80 S.Ct. 215].) The authority is inapposite. The only conduct that could possibly be "chilled" by the interrelation of these statutes is reliance on prayer alone in circumstances reached by sections 192(b) and 273a(1)—that is, when the conduct endangers or takes the life of a child. In such circumstances, free exercise is not implicated. (*Ante,* at pp. 138-141.)

practice will comply with this constitutional command. As will appear, in my view the statutory exemption as it now reads plainly violates the establishment clauses.

The California and federal Constitutions admonish the Legislature "to make no law respecting an establishment of religion." (U.S. Const., 1st Amend.; Cal. Const., art. I, § 4.) Two broad classes of legislation fall under this proscription: laws "affording a uniform benefit to *all* religions" and laws "that discriminate *among* religions." (*Larson* v. *Valente* (1982) 456 U.S. 228, 252 [72 L.Ed.2d 33, 52-53, 102 S.Ct. 1673], italics in original.) The constitutionality of the first class of enactments is traditionally measured against three criteria delineated by the United States Supreme Court in *Lemon* v. *Kurtzman* (1971) 403 U.S. 602 [29 L.Ed.2d 745, 91 S.Ct. 2105]. Under *Lemon,* a law must first have a secular legislative purpose; second, its principal or primary effect must neither advance nor inhibit religion; and third, it must not foster an excessive governmental entanglement with religion. (*Id.* at pp. 612-613 [29 L.Ed.2d at pp. 755-756].)

Laws in the second class strike closer to the heart of the establishment clause prohibition and thus require more demanding scrutiny. (*Larson* v. *Valente, supra,* 456 U.S. at p. 252 [72 L.Ed.2d at p. 52].) As the *Larson* court observed, "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." (*Id.* at p. 244 [72 L.Ed.2d at p. 47].) The essential attribute of this constitutional dictate is governmental neutrality with respect to matters of faith: "Government in our democracy, state and national, must be neutral in matters of religious theory, doctrine, and practice. It may not be hostile to any religion or to the advocacy of no-religion; and it may not aid, foster, or promote one religion or religious theory against another or even against the militant opposite. The First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion." (*Epperson* v. *Arkansas* (1968) 393 U.S. 97, 103-104 [21 L.Ed.2d 228, 234, 89 S.Ct. 266].)[1] If a law effects a preference among religions, the governmental policy is presumptively suspect and subject to strict scrutiny. (*Larson* v. *Valente, supra,* 456 U.S. at p. 246 [72 L.Ed.2d at p. 49].)

The court in *Larson* considered a provision exempting from the reporting and registration requirements of a charitable solicitations act only those

---

[1] Under the California Constitution this value is explicit. Article I, section 4, assures that "free exercise and enjoyment of religion without discrimination or preference are guaranteed." In view of this provision, "Preference thus is forbidden even when there is no discrimination." (*Fox* v. *City of Los Angeles* (1978) 22 Cal.3d 792, 796 [150 Cal.Rptr. 867, 587 P.2d 663].) The establishment clause of the California Constitution must be read in conjunction with this unqualified constitutional prohibition against religious preference to appreciate the full scope of its independent protections.

religious organizations receiving over 50 percent of their contributions from members or affiliated organizations. (*Id.* at p. 231 [72 L.Ed.2d at p. 39].) By plainly discriminating among religions in the allocation of the statutory exemption, the provision granted a denominational preference requiring strict scrutiny. (*Id.* at p. 246.) While acknowledging that the state had "a significant interest in protecting its citizens from abusive practices in the solicitation of funds for charity, and that this interest retains importance when the solicitation is conducted by a religious organization" (*id.* at p. 248 [72 L.Ed.2d at p. 50]), the court nonetheless determined that the 50 percent rule was not sufficiently tailored to the statutory objective to withstand constitutional scrutiny. (*Id.* at p. 251 [72 L.Ed.2d at p. 52].)

Section 270 similarly allocates its religious benefit on a selective basis. The statute excludes from criminal liability any parent who provides a minor with "treatment by spiritual means through prayer alone *in accordance with the tenets and practices of a recognized church or religious denomination, by a duly-accredited practitioner thereof.*" (Italics added.) The provision thus affords no protection for parents who otherwise treat their children "by spiritual means through prayer alone." Specifically denied the exemption are (1) parents not affiliated with a "recognized" church or religious denomination who nonetheless provide prayer treatment on the basis of personal religious beliefs or the teachings of an unrecognized sect, and (2) parents who provide prayer treatment in accordance with the tenets of a recognized denomination that does not "accredit" prayer "practitioners."

These excluded believers are not the fanciful product of a strained reading of the statutory language. In *People* v. *Arnold* (1967) 66 Cal.2d 438 [58 Cal.Rptr. 115, 426 P.2d 515], this court considered a religious exemption claimed under section 270 by a member of "the Church of the First Born," described as "a religious group believing in faith healing." (*Id.* at p. 442, fn. 1.) Whether, and on what basis, a court would determine that the Church of the First Born constitutes a "recognized" religion is a serious question not easily answered.[2] Furthermore, while the opinion in *Arnold* states that members of the group prayed with the defendant for a cure, there is no indication that they were "duly accredited practitioner[s]" of prayer treatment.

___

[2] Consider for example the case of Arthur Charles Grady, who was described in another case as "a self-styled 'peyote preacher' and 'way shower.' " (*In re Grady* (1964) 61 Cal.2d 887, 888 [39 Cal.Rptr. 912, 394 P.2d 728].) Grady "acted as the spiritual leader of a group of individuals consisting of [five] codefendants and himself. This group lived together in [the home of a codefendant]. Although [Grady] did not share in the living expenses of the group, he selected their food, taught them deepbreathing exercises, how to pray, 'and in general how to love the Christian life.' " (*Ibid.*) Would this group warrant "recognized" status under the terms of the statutory exemption if its members were instructed by Grady to provide prayer in lieu of medical care to their ill children?

(*Ibid.*) If not, Mrs. Arnold would have been denied the current statutory exemption even if the Church of the First Born had been "recognized." Indeed, certain well-known denominations decline to term anyone a "healer": "The so-called Pentecostal sects have some members who actively seek and encourage 'divine intervention,' but they do not ordinarily perform acts that are thought to 'heal' a sick person. In this sense, there are no 'healers'; the cure is thought to come directly from God." (Comment, *Religious Beliefs and the Criminal Justice System: Some Problems of the Faith Healer* (1975) 8 Loyola L.A. L.Rev. at pp. 413-414.)

Also denied the statutory exemption are parents whose use of prayer treatment stems from personal religious beliefs rather than the tenets of a recognized church or denomination. In other jurisdictions such parents have repeatedly prevailed on establishment and equal protection grounds against similarly formulated provisions. In *Davis* v. *State* (1982) 294 Md. 370 [451 A.2d 107], the court considered a challenge to a compulsory immunization statute exempting children whose parents objected because the procedure " 'conflicts with the tenets and practice of a recognized church or religious denomination of which he is an adherent or member . . . .' " (*Id.* at pp. 108-109, italics deleted.) The plaintiff "rested his objection [to the immunization] on his personal religious views rather than the tenets of any recognized church or religious denomination of which he was a member or adherent." (*Id.* at p. 109.) In *Dalli* v. *Board of Education* (1971) 358 Mass. 753 [267 N.E.2d 219], the plaintiff fell outside a similar exception to a compulsory immunization statute because she objected on the basis of "her personal 'belief in the Bible, and its teachings.' " (*Id.* at p. 220.) Finally, the court in *Brown* v. *Stone* (Miss. 1979) 378 So.2d 218, certiorari denied 449 U.S. 887 [66 L.Ed.2d 112, 101 S.Ct. 242], considered the claim of a parent whose minister submitted the following statement: " 'Be it known that the [C]hurch of Christ as a religious body does not teach against the use of . . . immunizations or vaccinations . . . . However, [plaintiff] who is a member of the . . . Church of Christ . . . does have strong convictions against the use of any kind of medications and we respect his views.' " (*Id.* at pp. 219-220; see also *Maier* v. *Besser* (1972) 73 Misc.2d 241 [341 N.Y.S.2d 411, 412]; cf. *Lewis* v. *Califano* (3d Cir. 1980) 616 F.2d 73, 75.) Were these parents charged with failure to furnish medical attendance under section 270, they would face conviction regardless of their alternative provision of "treatment by spiritual means through prayer alone."

The one group of parents squarely protected by the terms of the statute are Christian Scientists, whose denomination sponsored the 1976 amendment to section 270 enacting its religious exemption. It is thus more than fortuity that the word "practitioner," used by Christian Scientists to formal-

ly designate their healers, also appears in section 270 to describe the required providers of the exempted treatment. As the analysis of the amendment prepared for the Senate Committee on Judiciary frankly observed, the purpose of the legislation was to "Ensure that no parent *who uses Christian Science methods* to heal his or her child shall be liable for not providing recognized medical attention for the children." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 3843 (1975-1976 Reg. Sess.), italics added; accord, Sen. Democratic Caucus, 3d reading analysis of Assem. Bill No. 3843 (1975-1976 Reg. Sess.).)

By sparing the favored from criminal liability while condemning others for failure to cloak identical conduct in the mantle of a sanctioned denomination or procedure, the religious exemption of section 270 operates without neutrality "in matters of religious theory, doctrine, and practice," and thus cannot survive in the absence of a compelling state interest in its discriminatory effect. Unlike the exemption in *Larson,* however, which advanced an independent secular objective, the only discernible state interest in this exemption is religious accommodation per se. While accommodation has been sustained as a legitimate objective when it "reflects nothing more than the governmental obligation of neutrality in the face of religious differences" (*Sherbert* v. *Verner* (1963) 374 U.S. 398, 409 [10 L.Ed.2d 965, 83 S.Ct. 1790]), here the accommodation reflects nothing less than a denominational preference in the face of indistinguishable religious conduct. Manifestly this is not a compelling objective in the constitutional sense.

If the Legislature wishes to exempt from criminal liability those parents who rely on prayer treatment in lieu of medical care, the establishment clause requires at a minimum that the exemption be granted irrespective of denominational affiliation or practice. (*Gillette* v. *United States* (1971) 401 U.S. 437, 454 [28 L.Ed.2d 168, 183, 91 S. Ct. 828]; *Lewis* v. *Califano, supra,* 616 F.2d at p. 78 ["The establishment clause requires the government to extend the same benefits it currently extends to Christian Scientists . . . to all individuals who sincerely believe in faith healing"]; *Developments in the Law: Religion and the State* (1987) 100 Harv.L.Rev. 1606, 1738 ["The only legislative accommodations that can withstand establishment clause scrutiny are those that accommodate all religious objectors equally"].)[3] The conclusion is thus inescapable that the religious exemption found in section 270 violates the establishment clauses of the California and federal Constitutions. (Accord, *Dalli* v. *Board of Education, supra,* 267 N.E.2d at p. 223; *Davis* v. *State, supra,* 451 A.2d at pp. 113-114; *State* v. *Miskimens* (1984) 22

---

[3] It is of course a separate question whether a blanket exemption under section 270 for *all* parents who sincerely provide children with prayer treatment would survive under the establishment clause. However, an exemption discriminating *among* parents who provide prayer treatment as a matter of sincere religious practice surely amounts to an unconstitutional establishment of religion.

Ohio Misc.2d 43 [490 N.E.2d 931, 934]; *Maier* v. *Besser, supra,* 341 N.Y.S.2d at p. 414; *Kolbeck* v. *Kramer* (1964) 84 N.J.Super. 569 [202 A.2d 889, 892]; Note, *California's Prayer Healing Dilemma* (1987) 14 Hastings Const.L.Q. 395, 412-414; Comment, *Religious Beliefs and the Criminal Justice System: Some Problems of the Faith Healer* (1975) 8 Loyola L.A. L.Rev. 396, 429.)[4]

The exemption in section 270 is also invalid under the criteria set forth in *Lemon* v. *Kurtzman, supra,* 403 U.S. at pages 612-613 [29 L.Ed.2d at pages 755-756], even though "the *Lemon* v. *Kurtzman* 'tests' are intended to apply to laws affording a uniform benefit to *all* religions, and not to provisions . . . that discriminate *among* religions." (*Larson* v. *Valente, supra,* 456 U.S. at p. 252 [72 L.Ed.2d at pp. 52-53], italics in original, fn. omitted.) As noted above, *Lemon* requires that a statute (1) have a secular purpose, (2) neither advance nor inhibit religion, and (3) foster no excessive entanglement between government and religion.

I have already observed that the accommodative purpose of this statutory exemption reflects a nonsecular preference among adherents of prayer treatment rather than a neutral governmental response to genuine religious differences. While one might charitably argue that the exemption has the effect of identifying indicia of sincere religious conduct, thus facilitating administration of the statute, discrimination subject to the strictest scrutiny

---

[4] Defendant and the Church cite three cases in which exemptions reserved for adherents of a "recognized" church or denomination were upheld. (*Jaggard* v. *Comr. of Internal Revenue* (8th Cir. 1978) 582 F.2d 1189; *Varga* v. *United States* (D.Md. 1979) 467 F.Supp. 1113, affd. (4th Cir. 1980) 618 F.2d 106; *Kleid* v. *Board of Education* (W.D.Ky. 1976) 406 F.Supp. 902.) Each is readily distinguishable. Both *Varga* and *Jaggard* involved challenges to a statute exempting from the federal self-employment tax those individuals who belong to a recognized religious sect which opposes acceptance of the benefits of any private or public insurance and which provides otherwise for its dependent members. (*Jaggard, supra,* 582 F.2d at p. 1190; *Varga, supra,* 467 F.Supp. at p. 1116.) Employing a compelling interest test, the court in *Varga* found that the governmental distinction was justified: " 'The limitation by Congress of the exemption to members of religious sects with established tenets opposed to insurance and which made reasonable provisions for their dependent members was in keeping with the overall welfare purpose of the Social Security Act. This provision provided assurance that those qualifying for the exemption would be otherwise provided for in the event of their dependency.' " (*Id.* at p. 1118; accord, *Jaggard* v. *Comr. of Internal Revenue, supra,* 582 F.2d at p. 1190.)

The court in *Kleid* considered an exemption from a compulsory immunization statute reserved for "members of a nationally recognized and established church or religious denomination." (*Kleid* v. *Board of Education, supra,* 406 F.Supp. at p. 903, fn. 3.) The plaintiff challenged the statute as violative of the establishment clause because it denied its exemption to those who objected to immunization on " 'non-religious grounds.' " (*Id.* at p. 904.) The court thus did not consider discrimination *among* religions; the issue presented involved a religious exemption not otherwise provided for secular objectors. The opinion nowhere mentions the possibility under the statutory language of discrimination among the religious, and as such is inapposite.

cannot be justified on the basis of administrative convenience alone. (Cf. *Frontiero* v. *Richardson* (1973) 411 U.S. 677, 690 [36 L.Ed.2d 583, 594, 93 S.Ct. 1764].) Furthermore, the indicia are underinclusive and more likely to complicate rather than facilitate administration by requiring theological and social judgments that law enforcement officials and courts are not equipped to make. These administrative complications are closely linked to the troubling entanglement of church and state that the provision invites and *Lemon* forbids.

To apply section 270, law enforcement officials and courts are required to evaluate "the tenets and practices" of various religions, searching for a doctrinal sanction of "spiritual treatment by prayer alone"; they are called upon to consider whether individual healers have been "duly accredited" by a particular denomination; and most disturbing, they are required to ascertain whether a particular religious group is "recognized." This last inquiry requires prosecutors and law enforcement officials to judge in their discretion whether a particular religious group has reached the critical mass of size and acceptance necessary for statutory protection, and leaves courts with nothing but subjective experience and belief to guide the required determination.

The assistant legal affairs secretary to the Governor clearly anticipated the foregoing troubling scenario in her preenactment analysis of the 1976 amendment to section 270: "The bill requires that the religion or denomination be 'recognized.' No further definition is provided. While this would constitute a severe problem in the medical emergency situation, it would not present a problem where there is sufficient opportunity to argue the problem of religion." It is precisely the entangling prospect of public officials arguing "the problem of religion" as an aspect of their ongoing enforcement of section 270, coupled with the politically divisive implications of their judgments, that the establishment clause seeks to avert. (*Larson* v. *Valente, supra,* 456 U.S. at pp. 252-255 [72 L.Ed.2d at pp. 52-55].)

Defendant maintains that even if the statutory exemption violates the establishment clause, courts should nevertheless construe it in an edited fashion to avert the constitutional difficulties raised by its facially preferential language. This cannot be done. It is of course fundamental that "If feasible within bounds set by their words and purposes, statutes should be construed to preserve their constitutionality." (*Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 175 [167 Cal.Rptr. 854, 616 P.2d 836].) This is a limited interpretive function, however, and in no way delegates to courts the authority to rewrite the work of the Legislature. As Justice Tobriner observed with respect to the constitutionality of another provision of section 270, "If elimination of objectionable parts of a statute requires a wholesale

rewriting, a court's attempt to do so transgresses both the legislative intent and the judicial function." (*In re King* (1970) 3 Cal.3d 226, 237 [90 Cal.Rptr. 15, 474 P.2d 983], cert. den. 403 U.S. 931 [29 L.Ed.2d 709, 91 S.Ct. 2249]; see *Metromedia, Inc.* v. *City of San Diego* (1982) 32 Cal.3d 180, 187 [185 Cal.Rptr. 260, 649 P.2d 902].) Here, too, the unconstitutional aspect of the statute so clearly manifests a particular legislative intent that its elimination would amount to amendment by judicial fiat.

The Legislature has repeatedly designed statutory exemptions for parental use of prayer treatment with precisely the language found in section 270. Welfare and Institutions Code section 16509.1 excludes from its definition of neglect the provision of "treatment solely by spiritual means through prayer alone in accordance with the tenets and practices of a recognized church or religious denomination by a duly accredited practitioner thereof . . . ." Section 11165.2 of the Penal Code and Welfare and Institutions Code section 18950.5 incorporate this definition by reference in their separate provisions defining the relationship of prayer treatment to child abuse and neglect. Finally, newly amended Welfare and Institutions Code section 300 adopts the language nearly verbatim in its provision defining the relationship of prayer treatment to child dependency proceedings. (See also Welf. & Inst. Code, § 5006.) Repeated use of the precise language evinces a legislative affinity for an invalid formulation that cannot be ignored.

Had the Legislature confronted the choice of extending its religious exemption to all parents who sincerely rely on prayer treatment, no matter how unorthodox or unconventional their creed may appear, or alternatively to none at all, one cannot presume that it would have chosen the former rather than the latter option. The statutory provision thus must be considered as written. If the Legislature seeks to accommodate the practice of prayer treatment, it must more clearly evince its intent to do so in a nonpreferential manner to avert the fatal constitutional defects afflicting section 270.

Kaufman, J., concurred.

**BROUSSARD, J.,** Concurring and Dissenting—I agree with the majority that a prosecution may be maintained against petitioner for involuntary manslaughter. (Pen. Code, § 192, subd. (b).)[1] However, I cannot agree that the child endangerment provisions of section 273a are applicable to cases where the parent has omitted to provide necessary medical attendance. Rather the failure to provide necessary medical attendance is made punishable by section 270, and section 273a is not applicable to omissions to

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

provide care but to active conduct endangering the child. Moreover, even if the failure to provide necessary medical attendance were punishable under section 273a, the prayer exemption of section 270 must be read into section 273a or the exemption is pointless. It is overwhelmingly clear that the Legislature sought to preclude child endangerment liability of persons coming within the religious exemption in section 270, particularly where prayer is successful, and to apply section 273a to such persons would defeat the legislative intent rendering the religious exemption meaningless.

Section 270 provides in part: "If a parent of a minor child willfully omits, without lawful excuse, to furnish necessary . . . medical attendance . . . he or she is guilty of a misdemeanor . . ."[2] Section 273a provides that a person who "willfully causes or permits" child abuse or endangerment of the child's health or person is guilty of a felony or a misdemeanor. The section is divided into two subdivisions which use identical language to describe the conduct proscribed except that subdivision (1) of the section applies "under

---

[2] Section 270 provides: "If a parent of a minor child willfully omits, without lawful excuse, to furnish necessary clothing, food, shelter or medical attendance, or other remedial care for his or her child, he or she is guilty of a misdemeanor punishable by a fine not exceeding two thousand dollars ($2,000), or by imprisonment in the county jail not exceeding one year, or by both such fine and imprisonment. If a court of competent jurisdiction has made a final adjudication in either a civil or a criminal action that a person is the parent of a minor child and the person has notice of such adjudication and he or she then willfully omits, without lawful excuse, to furnish necessary clothing, food, shelter, medical attendance or other remedial care for his or her child, this conduct is punishable by imprisonment in the county jail not exceeding one year or in a state prison for a determinate term of one year and one day, or by a fine not exceeding two thousand dollars ($2,000), or by both such fine and imprisonment. This statute shall not be construed so as to relieve such parent from the criminal liability defined herein for such omission merely because the other parent of such child is legally entitled to the custody of such child nor because the other parent of such child or any other person or organization voluntarily or involuntarily furnishes such necessary food, clothing, shelter or medical attendance or other remedial care for such child or undertakes to do so.

"Proof of abandonment or desertion of a child by such parent, or the omission by such parent to furnish necessary food, clothing, shelter or medical attendance or other remedial care for his or her child is prima facie evidence that such abandonment or desertion or omission to furnish necessary food, clothing, shelter or medical attendance or other remedial care is willful and without lawful excuse.

"The court, in determining the ability of the parent to support his or her child, shall consider all income, including social insurance benefits and gifts.

"The provisions of this section are applicable whether the parents of such child are or were ever married or divorced, and regardless of any decree made in any divorce action relative to alimony or to the support of the child. A child conceived but not yet born is to be deemed an existing person insofar as this section is concerned.

"The husband of a woman who bears a child as a result of artificial insemination shall be considered the father of that child for the purpose of this section, if he consented in writing to the artificial insemination.

"If a parent provides a minor with treatment by spiritual means through prayer alone in accordance with the tenets and practices of a recognized church or religious denomination, by a duly accredited practitioner thereof, such treatment shall constitute 'other remedial care', as used in this section."

circumstances or conditions likely to produce great bodily harm or death" and subdivision (2) of the section applies "under circumstances or conditions other than those likely to produce great bodily harm or death." Subdivision (1) provides that its violation is punished by imprisonment in the county jail not exceeding one year or in the state prison for two, four or six years. Violation of subdivision (2) is a misdemeanor.[3]

We must interpret the statutes "in accordance with applicable rules of statutory construction, fundamental among which are those which counsel that the aim of such construction should be the ascertainment of legislative intent so that the purpose of the law may be effectuated [citation]; that a statute should be construed with reference to the entire statutory system of which it forms a part in such a way that harmony may be achieved among the parts [citations]; and that courts should give effect to statutes 'according to the usual, ordinary import of the language employed in framing them.' [Citations.]" (*Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 918 [80 Cal.Rptr. 89, 458 P.2d 33]; *People* v. *Woodhead* (1987) 43 Cal.3d 1002, 1007-1008 [239 Cal.Rptr. 656, 741 P.2d 154]; *People* ex rel. *Younger* v. *Superior Court* (1976) 16 Cal.3d 30, 40 [127 Cal.Rptr. 122, 544 P.2d 1322].)

When we follow the fundamental rules of statutory construction it is clear that sections 270 and 273a are both concerned with the protection of the health and person of children, that section 270 is applicable to a willful failure to provide necessary care and that section 273a is not applicable to a failure to provide medical care but to willful active conduct causing harm or endangering the child's health or person.

There can be no rational doubt that the Legislature intended that section 270 should be applicable where a parent fails to provide medical care endangering the health or person of a child. The language of the section speaks of the omission to "furnish necessary . . . medical attendance." Medical attendance is only necessary when the health or person of the child is

---

[3] Section 273a provides: "(1) Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of such child to be injured, or willfully causes or permits such child to be placed in such situation that its person or health is endangered, is punishable by imprisonment in the county jail not exceeding one year, or in the state prison for 2, 4, or 6 years.

"(2) Any person who, under circumstances or conditions other than those likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of such child to be injured, or willfully causes or permits such child to be placed in such situation that its person or health may be endangered, is guilty of a misdemeanor."

endangered. The plain language of the first sentence of the section shows that the section applies to child endangering conduct. If the parent in the instant case had not come within the prayer exemption, it is clear that she could be prosecuted under section 270. (See *People* v. *Arnold* (1967) 66 Cal.2d 438, 451, 452 [58 Cal.Rptr. 115, 426 P.2d 515] [upholding misdemeanor manslaughter charge on the basis of section 270 prior to adoption of the religious exemption].)

Section 270 is not merely an economic regulation requiring reimbursement of those providing medical attendance. While the third sentence of the section provides that a parent is not relieved of criminal liability because another furnishes the medical care, that sentence may not be read as prohibiting criminal liability when no one provides the necessary support. *People* v. *Sorenson* (1968) 68 Cal.2d 280, 287 [66 Cal.Rptr. 7, 437 P.2d 495, 25 A.L.R.3d 1093], the principal case relied upon by the majority in concluding that the purpose of section 270 is reimbursement (maj. opn., p. 124), expressly states that " 'the principal statutory objectives are to secure support of the child' " and to protect the public fisc. If there was any doubt as to the legislative intent that the statute should be applied when the child does not receive necessary medical attendance as well as when the state seeks reimbursement, such doubt is dispelled by the adoption of the religious exemption in the last sentence of the section. As the majority recognize, the legislative history shows that the Legislature sought to "shield from liability those parents who provide prayer in lieu of medical care" (maj. opn., pp. 122-123), and it would be absurd to conclude that by adopting that provision the Legislature intended only to exempt a parent from a duty to pay for medical care which was not furnished.

Accordingly section 270, like section 273a, is applicable to child endangerment, and both sections are applicable whether or not the child is injured (see *People* v. *Peabody* (1975) 46 Cal.App.3d 43, 46 [119 Cal.Rptr. 780]; *People* v. *Harris* (1966) 239 Cal.App.2d 393, 398 [48 Cal.Rptr. 677]). Both sections are found in the same chapter of the Penal Code. The statutes are in pari materia. (*People* v. *Caudillo* (1978) 21 Cal.3d 562, 585 [146 Cal.Rptr. 859, 580 P.2d 274]; see 2A Sutherland, Statutory Construction (Sands, 4th ed. 1984) § 51.03, p. 467.) Accordingly, it is our duty to construe them together and harmonize them.

We cannot reject application of the pari materia rule on the grounds that section 270 deals not only with child endangerment but also with reimbursement or that section 273a deals not only with child endangerment but also with child abuse. If the pari materia rule were limited to identical statutes, it would serve no purpose at all and could never be applied. The basis of the pari materia rule is that both statutes share the same purpose or

object. (*Ibid.*) The pari materia rule applies although the statutes may have additional dissimilar objectives so long as they also share the same common objective.

When we harmonize the statutes, the result is clear. Section 270 imposes a duty upon parents to provide the identified "necessary . . . medical attendance," and imposes criminal liability when the parent "willfully omits" to do so, thereby endangering the child. Section 273a imposes criminal liability for willfully causing or permitting child endangerment. To avoid conflict between the sections, section 273a should not be construed to apply when the asserted criminal conduct is the omission to perform the duties imposed by section 270, but only when the basis of the child endangerment is active conduct endangering the child, willfully causing or permitting child endangerment. The only active conduct shown by the evidence is that petitioner prayed. Prayer is not prohibited by section 273a.

Moreover, even if it is concluded that the failure to provide necessary medical attendance is punishable under section 273a in cases where the section 270 prayer exemption is inapplicable, we may not apply section 273a to cases where that exemption applies. The conclusion is unavoidable that the Legislature intended to exempt parents who utilize prayer treatment from the statutory requirement to provide "necessary . . . medical attendance." As pointed out above, medical attendance is necessary when its absence endangers the health or person. To hold that section 273a applies to parents who utilize prayer treatment in accordance with the exemption in section 270 means that those exempt may *always* be prosecuted under section 273a for child endangerment and that, since injury is unnecessary for child endangerment, it would be irrelevant whether God answered the prayers.

The legislative intent to provide some exemption from criminal liability is overwhelmingly clear, although the extent of the exemption may not be clear. The exemption is obviously directed at the duty to protect the child by securing medical attendance imposed by section 270. It would be unrealistic and contrary to all of the legislative history we have been furnished to conclude that the exemption is directed at the economic aspect of section 270.[4] There is nothing in the legislative history to indicate that the Legisla-

---

[4] I agree with the majority conclusion that no weight may be given to the Assembly staff report urging that section 273a should be amended to incorporate the religious exemption or to the Senate staff report raising questions as to a possible conflict between the exemption and the child harm provisions of section 273a. (See maj. opn., pp. 128-129.) We cannot tell whether the members of the Legislature decided the amendment was undesirable, was unnecessary or should be deferred so as to avoid interruption of the enactment process.

I would also point out that neither report focused on child endangerment; both were concerned with the necessity for amendment of section 273a with respect to the child abuse por-

ture sought to eliminate a nonexistent duty to pay for medical services which were never rendered or was concerned primarily with reimbursement for medical services paid for by others.

The religious exemption must be applied to the child endangerment provisions of section 273a or the legislative intent is totally defeated. It must be applied to cases where the failure to provide necessary medical attendance endangers the child's health but does not result in harm.

I would reverse the judgment of the Court of Appeal with directions to grant the petition for writ of prohibition insofar as it seeks dismissal of the section 273a charge and to deny it insofar as it seeks dismissal of the manslaughter charge.

Petitioner's application for a rehearing was denied January 9, 1989.

---

tion of the section and the manslaughter statute, cases where there is not merely endangerment but harm.